IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01218-MEH

BRIAN F. WALSHE,

      Plaintiff,

v.

ROBERT ZABORS, and
ENOVATION PARTNERS, LLC,

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are Defendants' Motion for Summary Judgment [filed December 31, 2015; docket #41] and Plaintiff's Motion for Summary Judgment [filed February 23, 2016; docket #48]. The motions are fully briefed and the Court finds oral argument (not requested by the parties) would not assist in its adjudication of the motions. For the following reasons, the Court grants in part and denies in part the parties' motions as set forth herein.[1]

## BACKGROUND

### I.    Procedural History

      Plaintiff initiated this action on June 10, 2015 alleging essentially that Defendants breached a partnership agreement and a fiduciary duty owed him; Plaintiff also brings claims for promissory estoppel and unjust enrichment. Complaint, docket #1. Defendants initially responded to the

---

[1]The parties consented to the jurisdiction of this Court pursuant to D.C. Colo. LCivR 40.1 on August 3, 2015. Docket #12.

Complaint by filing an Answer, then, after approximately three months into the discovery period, were granted leave to file an Amended Answer and Counterclaims alleging Plaintiff misappropriated trade secrets and breached a fiduciary duty owed them.  Dockets ##20, 39.

Plaintiff answered on December 15, 2015; shortly thereafter, Defendants filed the present motion seeking summary judgment and arguing Plaintiff's claims, all based on the existence of a partnership interest in Enovation Partners LLC, fail because Plaintiff was never a "partner" nor "member" of the company.  After Defendants' motion was briefed, Plaintiff filed his motion seeking summary judgment and arguing Defendants' counterclaims based on Plaintiff's possession or use of company information fail because Plaintiff was entitled to have the information, the information belonged to Plaintiff, and/or Plaintiff only used any company information to benefit Enovation by collaborating with the company on joint projects.

## II.    Findings of Fact

Upon review of the motions for summary judgment and the supporting papers attached, the Court finds the following facts, viewed in the light most favorable to the non-moving party.[2]

1.      Enovation Partners LLC ("Enovation") is a Washington limited liability company with its principal place of business in Des Plaines, Illinois.

2.      Enovation was founded in 2013 with three members: Defendant Robert Zabors, Jeffrey Clark, and GTI International ("GTI"), a non-voting corporate member.  As of December 30, 2015, the members included Robert Zabors, Jeffrey Clark, Alvaro Daniel Gabaldon, Todd Allmendinger, William Kemp, and West River Equity Partners, LLC - Series E.  *See* Washington Secretary of State record, docket #41-5.

---

[2]Unless otherwise cited, these facts are undisputed.

3.      Enovation is governed by an operating agreement, which identifies the members of the LLC and dictates how profits and losses are shared and distributed among the members. *See* Enovation Amended and Restated Operating Agreement ("Operating Agreement"), docket #41-1.

4.      Section 2.7 of the Operating Agreement governs the admission of new members, and states:

> Section 2.7 New Members. The Members may admit a new Member or Members, as the case may be, to the Company, only if such new Member (i) is approved unanimously by the Members; (ii) delivers to the Company his required capital contribution; (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto; and (iv) delivers such additional documentation as the Members shall reasonably require to so admit such new Member to the Company.

Operating Agreement, § 2.7, docket #41-1.

5.      Plaintiff was never a member of Enovation and never signed Enovation's Operating Agreement.

6.      On September 11, 2013, Zabors emailed to Plaintiff a "draft" employment offer letter with a message, "basic document for discussion." Docket #44-4. The letter included a proposed "base salary draw," "additional compensation potential," and "equity." *Id.* Plaintiff never signed the letter.

7.      Plaintiff joined Enovation as an employee on October 1, 2013.

8.      Plaintiff has been the owner of a company called Altera Energy d/b/a ION Consulting ("ION") since its inception in 2010. Deposition of Brian Walshe, November 17, 2015 ("Walshe depo"), 23: 4-22, docket #41-2. ION was not merged with Enovation and was not rendered "inactive" (as that term is defined by the Colorado Secretary of State) during Plaintiff's employment with Enovation. *Id.*, 59: 16-25, 60: 1-23.

9.      Plaintiff electronically signed a co-employment agreement with Enovation and its HR provider, ADP, which made clear that Plaintiff was an "employee-at-will" and that Plaintiff or

Enovation was "free to end the employment relationship at any time, for any or no reason, with or without cause or advance notice."

10.     As an employee of Enovation, Plaintiff completed an I-4, a W-4, received a W-2, and received a paycheck where federal and state taxes were withheld.  Plaintiff also was to receive a "subjective bonus" based on a "combination" of "top line revenue, profitability, and firm building activity."  Deposition of Robert Zabors, November 12, 2015 ("Zabors depo"), 87: 25, 88: 1-12, docket #41-7.

11.     Zabors testified that there was "never" a "partner title" at Enovation; rather, he "wanted people to think over and over again of themselves as working together to grow, and that's my perspective. So we all want to work together as partners."  Zabors depo, 79: 21-25, docket #44-1.

12.     The term "founding partner" at Enovation is not a title, but a "descriptor"; "[w]e have people with all kinds of different titles who call themselves founding partners, a wide variety of titles call themselves founding partners."  *Id.*, 104: 17-25, 105: 1; 152: 4-15.

13.     Plaintiff was a "founding partner" in that he was "senior level" and "there during the first year" of the firm's existence.  *Id.*, 105: 3-23, 111: 5-25.  The signature block on Plaintiff's email account at Enovation refers to him as "Partner."  Docket #44-8.

14.     Zabors referred to Plaintiff as "his partner" or "a partner" at Enovation to third parties during the time Plaintiff worked there.  *Id.*, 135: 6-25; 141: 12-16; dockets ##44-6, 44-7.

15.     Like Plaintiff, Zabors expected that Plaintiff would receive shares (equity) in Enovation. *Id.*, 107: 13-25, 108: 1-7.  Such receipt was conditioned upon Plaintiff signing an employment agreement for which Plaintiff and Zabors discussed compensation and equity provisions throughout Plaintiff's year at Enovation.  *Id.*, 109: 12-25, 110: 1-5.

16.     Plaintiff believed that he was entering a partnership with Zabors, the "other partners," and

Enovation, and they were going to negotiate and discuss an operative agreement and then sign an LLC agreement.  Walshe depo, 40: 14-25.  He believes he was "told" he "was joining Enovation Partners as a partner and soon-to-be member."  *Id.*, 42: 18-22.

17.     Plaintiff's share in the partnership was "never defined while [he] was there."  *Id.*, 43: 18-25, 44: 1-9.  He and Zabors "were working toward an agreement" as to his share, but they "never came to an agreement on those issues."  *Id.*, 83: 8-21.  However, Plaintiff understood before he joined Enovation that he and Zabors agreed the partners "would continually distribute new equity every year, and the shares that [he] would earn would be in proportion to [his] revenue generation."  *Id.*, 130: 9-20.  Specifically, Plaintiff believed in September 2013 that he and Zabors had "an understanding and a path that enough equity [was] going to be allocated to dilute the partners so that one person [would] not be controlling all of it."  *Id.*, 146: 3-25, 147: 1-17.

18.     At a September 2013 meeting of the "founding partners" of Enovation – Plaintiff, Zabors, Clark, Allmendinger, Gabaldon, Powell, Kemp, and Wiley – they discussed the "need[ ] to resolve a defined equity and compensation model" and Zabors stated they "would have the compensation model finalized soon and certainly by February so that [they] ... could use the proceeds to pay [their] income tax in 2014."  *Id.*, 155: 11-25, 156: 1-15.

19.     The partners never discussed a minimum level of revenue generation from which equity would be allocated, but they discussed a general target of $1 million per partner.  *Id.*, 187: 15-25, 188, 189: 1-3.

20.     On a flight from Albuquerque on a Monday in April 2014, Zabors proposed to Plaintiff what he called a "Founding Partner Equity Plan ('FPEP')" in which Zabors "would designate some portion of 'his equity' to be distributed to the other partners over the next ten years."  *Id.*, 127: 6-22.  Later that week, Plaintiff told Zabors that "if that was what he was proposing and if that was what

he is intending, that would not be of interest to me." *Id.*, 128: 12-20.

21.     On June 5, 2014, Zabors emailed to Plaintiff a draft proposed "Operating Agreement for Enovation Partners, LLC" with a message asking for Plaintiff's review, ideas, and input "as a partner and a thought partner," and informing Plaintiff of the "capital structure" as follows:

        GTI - 20%
        Zabors - 45.625%
        Clark - 6.875%
        Kemp - 2.5%
        FPEP - 25%

Docket #44-5.

22.     In an email to Zabors on June 19, 2014, Plaintiff discussed his thoughts after a meeting with Zabors on June 17, 2014 concerning (1) Zabors' proposed "equity allocation framework" which was "not attractive enough for [Plaintiff] to join the firm"; (2) Plaintiff's bonus for the fiscal year ending June 2014; and (3) Plaintiff's intent to "present a proposed equity and bonus payout scenario" which would "determine his future role with Enovation" but could also "be used as a template for all partner compensation discussion."  Docket #52-6 at 4-5.

23.     In July 2014, Plaintiff sent an email to Zabors with an attached "potential equity allocation framework to consider."  Zabors depo, 144: 20-25, 145: 1-4.  Zabors did not understand Plaintiff's concept that "equity in the firm should be shared in some relative proportion to the value created by each of the partners during each phase of its growth," in that he "agreed consistently with equity allocations based on performance above a threshold, but the idea of having phases of growth and defining them in this way this was -- I think this was probably new to me at this point on this page, but I thought it was a good enough idea to give it to the comp consultant and a broader group for discussion." *Id.*, 145: 16-25, 146: 1-21.

24.     On October 1, 2014, Plaintiff drafted a letter to Zabors in which he stated, "I have concluded

that I can no longer wait until the various uncertainties are resolved, and this letter is to inform you of my intent to resign and disentangle from our existing business relationship inside Enovation." Docket #41-4.  Plaintiff also expressed his interest in restarting discussions "if ... Enovation gets to the point where a partner equity and compensation package is defined" and in "jointly pursuing consulting project opportunities together."  *Id.*

25.     Plaintiff handed the letter to Zabors on their way into a partners' meeting on October 2, 2014. Zabors depo: 194: 18-21.  Zabors recalls that Plaintiff "handed [the letter] to me and basically said I decided to resign. I took that and then later in front of everybody he said he resigned."  *Id.*, 195: 3-16.

26.     At the meeting on October 2, 2014, Enovation's founding partners, including Plaintiff, met with a compensation consultant and discussed equity, compensation, and "general principles."  *Id.*, 174: 16-25, 175: 1-16.  After Plaintiff left the meeting, he was "not aware that [his] status or anything had changed ... except that [he] had telegraphed to Bob, 'This is not going to work for me. Any future work that I originate is going to be under Ion Consulting, not Enovation Partners.' And we can collaborate and share and do that on whatever status made sense for him."  *Id.*, 176: 8-24.

27.     On October 16, 2014, Zabors sent an email to Enovation "partners" Allmendinger, Kemp, Clark, Gabaldon, Wiley, and Powell regarding "open items with Brian and EP."  Docket #48-6. Among the items listed are Plaintiff's request to redirect a customer invoice to his firm; Plaintiff's statement that since he did not have a final agreement on equity and resigned just as Enovation was starting the process to finalize a "plan," he did not believe costs (shared expenses) applied to him; Plaintiff's request to stay on Enovation's healthcare plan through the end of the year; Plaintiff's request to keep his email at Enovation "open" and "gradually transition people to his Ion email"; and Zabors' statement to Plaintiff that "any 111d work he sells (or other leads) that are based on work

7

done at EP and by EP staff should be identified and delivered through EP." *Id.*

28.      On November 10, 2014, Plaintiff drafted a letter to the "Partners at Enovation Partners" in which he stated, "I am in the process of developing the detailed timeline and supporting documents that substantiate my claim as we slide inevitably towards litigation."   Docket #52-6.   The letter essentially describes Plaintiff's "version of the events" leading up to his separation from Enovation and he states, "As we parted [on October 2, 2014], I had thought we were ending my role as partner, but we all had an interest in continuing to collaborate and working together on future projects albeit in a subcontractor role." *Id.*

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).   The Court will grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c).   A fact is material if it might affect the outcome of the suit under the governing substantive law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."   *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).   Only admissible evidence may be considered when ruling on a motion for summary judgment.   *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

The Court will begin with an analysis of whether Defendants are entitled to summary judgment on the Plaintiff's claims, then follow with its analysis of whether Plaintiff is entitled to summary judgment on the counterclaims.

## I.   Plaintiff's Claims

Plaintiff alleges the Defendants breached a partnership agreement and a fiduciary duty owed

him, and have been unjustly enriched and are estopped from denying promises made by Zabors to Plaintiff.

A.      Breach of Partnership Agreement

Essentially, Plaintiff alleges he and the Defendants entered a "Partnership Agreement" "whereby Walshe and Zabors would contribute client resources and client consulting projects to Enovation" but Zabors' "intentional and misleading conduct in negotiating" with Plaintiff caused Defendants to "fail[ ] to properly put in place an equity model and revenue distribution system as agreed to by the partners." Complaint, ¶¶ 22-25, docket #1. In addition, "[a]t Zabors' direction, Enovation failed and refused to properly reimburse Plaintiff for his incurred business expenses." *Id.*, ¶ 26. Defendants counter that "for Plaintiff to prevail, he must be a 'partner' at Enovation." Docket #41. They also contend that Plaintiff fails to demonstrate a "separate partnership agreement" among he and the Defendants "or anyone else at Enovation." Docket #47.

To establish a breach of contract under Colorado law,[3] Plaintiff must prove: "(i) the existence of a binding agreement; (ii) the plaintiff's performance of its obligations (or some justification for its non-performance); (iii) the defendant's failure to perform its obligations; and (iv) resulting damages." *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F. Supp. 2d 1238, 1243 (D. Colo. 2013) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).

Here, to the extent Defendants argue Plaintiff must be deemed a "partner" or "member" of Enovation to succeed on this claim, the Court disagrees. *See Johnson v. Chilcott*, 599 F. Supp. 224, 227 (D. Colo. 1984) ("If the parties have placed themselves in a relation which constitutes a partnership, it is not determinative that they call, or do not call, themselves a partnership, or that they expressly deny that a partnership exists.") (citing *Richardson v. Keely*, 58 Colo. 47, 142 P. 167

---

[3]In this briefing, the parties do not dispute that Colorado law applies.

(1914)).   Rather, the question here is whether an agreement existed – outside of Plaintiff's employment with Enovation for which he received a salary – between the Plaintiff and Defendants of which there has been a breach resulting in damages.

Plaintiff characterizes the alleged breached agreement as a "partnership agreement" and argues "the formation of a contract is irrelevant to the formation of a partnership."  Response, docket #44 at 14.  The Court disagrees.  "The hallmarks of a partnership under Colorado law include 'a contract of the parties ... whereby they agree to place their money, effects, labor and skill in a lawful business and to divide the profits and bear the loss in certain proportions.'"  *Rosania v. Group O, Inc.*, No. 13-cv-00398-MSK, 2014 WL 679884, at *6 (D. Colo. Feb. 20, 2014) (quoting *Mann v. Friden*, 287 P.2d 961, 964 (Colo. 1955) (en banc) and citing Colo. Rev. Stat. § 7-60-106(1)[4] (defining a partnership as an association of to or more persons to carry on a business "as co-owners")); *see also Sender v. Simon*, 174 B.R. 601, 604 (D. Colo. 1994) ("As the Colorado Supreme Court has stated: '***A partnership can only be created by a contract of the parties*** and that contract is one whereby they agree to place their money, effects, labor and skill in a lawful business and to divide the profits and bear the loss in certain proportions.'") (quoting *Mann*, 287 P.2d at 964)) (emphasis added).

A contract is formed when an offer is made and accepted, and the agreement is supported by consideration.  *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008).  Acceptance of an offer is generally defined as words or conduct that, when objectively viewed, manifests an intent to accept an offer.  *Id.*  A person who, with knowledge of an offer's terms, voluntarily takes the benefits of the offered services without objection is deemed to have accepted the offer and formed

---

[4]The amendments to the statute since 1955 have included language involving only limited liability partnerships, which are not at issue here.

a contract. Restatement (Second), Contracts § 69.

Colorado recognizes the existence of a contract implied from the conduct of the parties. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986) (en banc); *A.R.A. Mfg. Co. v. Cohen*, 654 P.2d 857, 859 (Colo. App. 1982). There must be a meeting of the minds as to the essential terms before any agreement will be implied. *See A.R.A. Mfg. Co.*, 654 P.2d at 859; *see also Dunning v. Thomas*, 14 P. 49, 51 (Colo. 1887) ("An agreement is a meeting or accord of two or more minds as to a particular thing"). "[W]hen the existence of a contract is in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists." *I.M.A., Inc.*, 713 P.2d at 887.

With these legal standards in mind, the Court must determine whether material factual issues exist regarding whether Plaintiff and Defendants agreed (1) to place their money, effects, labor and skill in a lawful business and (2) to divide the profits and bear the losses in certain proportions. *See Mann*, 287 P.2d at 964; *Grau v. Mitchell*, 397 P.2d 488, 489 (Colo. 1964) (en banc) (citing *Kent v. Cobb*, 133 P. 424, 426 (Colo. App. 1913)).

Here, the Plaintiff alleges that he "diverted his client business from ION to Enovation and devoted all of his time and attention to obtaining and providing consulting services for Enovation's benefit" and Zabors "promised his best efforts to develop and maintain Enovation's consulting business," both with the "intent that the profits and losses of the company would be split on an equitable basis." Complaint, ¶ 22. Defendants argue (1) the undisputed facts demonstrate Plaintiff was simply an employee of Enovation, and (2) there was never actual agreement as to terms of the Plaintiff's equity interest in the company.

First, the Court finds there is a genuine dispute as to whether the evidence, including Plaintiff's contributions to Enovation, demonstrate he was simply an "employee" of Enovation;

although the evidence reflects Plaintiff signed what Defendants characterize as a "co-employment agreement' with Enovation and he received a salary for his work there, it also reveals that, with Zabors' knowledge, Plaintiff diverted the work he was performing with clients from his own business, ION, to Enovation for the benefit of Enovation.   There is nothing in the employment agreement reflecting that Plaintiff would receive a salary for anything more than his work as an employee for Enovation; the agreement does not contemplate that Plaintiff would bring his own clients to Enovation.  Consequently, a reasonable juror could conclude Plaintiff and Zabors agreed that Plaintiff would "place [his] money, effects, labor and skill in a lawful business" for the purpose of forming a partnership.

Second, Defendants contend that the only agreement between Plaintiff and Zabors was "an agreement to later agree on an equity plan," which is insufficient to show a binding agreement.  The Court agrees that no genuine issue of material fact exists as to whether Plaintiff and Zabors agreed "to divide the profits and bear the losses in certain proportions."

There can be no binding contract if it appears that further negotiations are required to work out important and essential terms.  *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1248 (Colo. App. 2001) (citing *Am. Mining Co. v. Himrod-Kimball Mines Co.*, 124 Colo. 186, 235 P.2d 804 (1951) (en banc)).  Agreements to agree in the future are generally unenforceable because the court cannot force parties to come to an agreement. *Griffin v. Griffin*, 699 P.2d 407, 409 (Colo. 1985) (en banc).  Here, it is undisputed that Plaintiff and Zabors had not agreed on a division of the equity in the company before he "resigned" from the partnership.  In fact, the lack of agreement was the very reason for Plaintiff's resignation: "I have appreciated the time you spent with me over the past 7 months ... to try to develop some agreement on how Enovation Partners' equity might be divided. ... However, I have concluded that I can no longer wait until the various uncertainties are

13

resolved, and this letter is to inform you of my intent to resign and disentangle from our existing business relationship inside Enovation."  Dockets ## 41-4; 48-5.

Citing Zabors' deposition, Plaintiff argues that "[t]he only term of the partnership that had not been agreed upon was the method of determining allocation of profits and losses, although it was agreed that performance and revenue generation for that period of time would be relevant to the distribution."  Response, docket #44 at 11.  When asked during his deposition about an equity allocation proposal Plaintiff submitted in July 2014,[5] Zabors testified that he did not understand Plaintiff's proposition that "equity in the firm should be shared in some relative proportion to the value created by each of the partners during each phase of its growth" and stated, "I agreed consistently with equity allocations based on performance above a threshold, but the idea of having phases of growth and defining them in this way this was -- I think this was probably new to me at this point on this page, but I thought it was a good enough idea to give it to the comp consultant and a broader group for discussion."  Zabors depo, 145: 8-25, 146: 1-21.

Zabors' testimony does not establish that he and Plaintiff had agreed "to divide the profits and bear the losses in certain proportions."  That they may have agreed generally to divide the equity is not enough.  The evidence reflects no agreement identifying and/or establishing any proportions of distribution or loss.  Such lack of agreement is material to the Plaintiff's stated damages resulting from Defendants' alleged "fail[ure] to properly put in place an equity model and revenue distribution system as agreed by the partners."  Complaint, ¶ 25.  The evidence demonstrates no factual question regarding whether the partners had a meeting of the minds as to "an equity model and revenue distribution system."  Therefore, the Court will grant summary judgment in favor of the Defendants on Plaintiff's first claim for relief seeking damages resulting from Defendants' alleged failure to put

---

[5] A copy of this exhibit was not provided to the Court.

in place an equity model and revenue distribution system.

The Court notes, however, that Plaintiff also alleges he and Zabors "agreed that Plaintiff Walshe would receive reimbursement for his business[-]related expenses."  Complaint, ¶ 26. Plaintiff does not articulate whether such agreement was made in the scope of his employment or during the attempts to form a separate partnership.  Nevertheless, Defendants do not address this portion of Plaintiff's breach of agreement claim; accordingly, this portion of the claim will proceed to trial.

B.      Breach of Fiduciary Duty

In his second claim for relief, Plaintiff alleges Defendants owed him a fiduciary duty "to manage Enovation in good faith" and they breached such duty by "failing to properly manage the business; [to] collect, analyze, and produce timely and accurate financial information of the company for the partners [or to direct GTI to do so]; and to negotiate and agree to an equity model and revenue distribution system."  Complaint, ¶¶ 29, 30.  Defendants argue that they owed no fiduciary duty to Plaintiff.

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Accident & Injury Med. Specialists, P.C. v. Mintz*, 279 P.3d 658, 663 (Colo. 2012) (en banc) (quoting *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993) (en banc)). Independent legal duties of care owed by a fiduciary include a duty to act with utmost loyalty on behalf of, and for the benefit of, the other party. *Id.* (*citing Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo. 1996) (en banc)). Other than those fiduciary relationships recognized as a matter of law, such as attorney-client or trustee-trust beneficiary, the Colorado Supreme Court has recognized other fiduciary relationships where one party occupied a superior position relative to another and assumed a duty to act in the

dependent party's best interest and where one party had extensive influence and control over the other's interests.  *Id.*

"Fiduciary relationships that derive from a special relationship of trust, reliance, influence, and control are distinguishable from business relationships involving parties dealing at arm's length for mutual benefits."  *Id.* (citing *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991) ("[P]arties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties.") and 37 C.J.S. Fraud § 11 (2008) ("Most business relationships or contractual relationships . . . do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial or business transactions.")).

Defendants argue that Plaintiff was simply an employee, not a partner, and, thus, they owed him no fiduciary duties pursuant to the Tenth Circuit's opinion in *Combs v. PriceWaterhouse Coopers LLP*, 382 F.3d 1196 (10th Cir. 2004):

> "Before there can be a breach of a fiduciary duty, a fiduciary relationship or a confidential relationship must exist." *Turkey Creek, LLC v. Rosania*, 953 P.2d 1306, 1312 (Colo. Ct. App. 1998). As such, Mr. Combs cannot bring this suit solely in his capacity as an employee because, while an employee normally owes fiduciary duties to his employer, employers do not generally owe fiduciary duties to employees under Colorado law. *See Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486 (Colo. 1989) (employee owes employer duty of loyalty); Equitex, Inc. v. Ungar, 60 P.3d 746, 752 (Colo. Ct. App. 2002) ( "fiduciary duties are not mutual"); *Bithell* [*v. Western Care Corp.*, 762 P.2d 708, 714 (Colo. Ct. App. 1988)] (corporation does not owe independent contractor fiduciary duties); *Vitale v. Steinberg*, 307 A.D.2d 107, 764 N.Y.S. 2d 236, 237 (N.Y. App. Div. 2003) ("An employer-employee relationship providing for the division of profits will not give rise to a fiduciary obligation on the part of the employer absent an agreement to also share losses."). We can find, and Mr. Combs cites, no rationale for finding that Ms. Bennett owes him fiduciary duties in his capacity as an employee of AIS.

*Id.* at 1200 n.2.  Plaintiff bases this claim solely on his contention that he and the Defendants had formed a "partnership."  Response, docket #44 at 18-19.  However, in light of the Court's findings above, the Court must reject Plaintiff's position.  Even if the Court could discern some sort of

relationship between Plaintiff and the Defendants other than his employment relationship, the Court must conclude the evidence demonstrates Plaintiff and Zabors were dealing at arm's length for mutual benefits; as indicated throughout Plaintiff's communications with Zabors, Plaintiff was able to "disentangle" from the relationship at any point that he felt "it was not attractive enough for" him. *See, e.g.,* docket #52-6 at 4-5. These circumstances do not suggest a relationship "where one party occupied a superior position relative to another and assumed a duty to act in the dependent party's best interest," "where one party had extensive influence and control over the other's interests," or "where one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the dependent party." *See Mintz*, 279 P.3d at 663.

The Court finds the evidence demonstrates no genuine issues of fact as to whether Defendants owed Plaintiff a fiduciary duty and, thus, the Court will grant Defendants' motion for summary judgment in their favor on Plaintiff's second claim for relief.

C.    Promissory Estoppel

Although not articulated by the Plaintiff, the Court assumes he brings his promissory estoppel claim in the alternative to his breach of agreement claim. *See Wheat Ridge Urban Renewal Authority v. Cornerstone Group XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007) (en banc) (recovery in Colorado on a theory of promissory estoppel is permissible when there is no enforceable contract).

Colorado has adopted the promissory estoppel doctrine as articulated in the Restatement (Second) of Contracts § 90. *Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995) (en banc). The doctrine "encourages fair dealing in business relationships and discourages conduct which unreasonably causes foreseeable economic loss because of action or inaction induced by a specific promise." *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo. 1983) (en banc). "It provides relief to

those harmed because they relied on another's promises, even without an enforceable contract." *G&A Land, LLC v. City of Brighton*, 233 P.3d 701, 703 (Colo. App. 2010) (citing *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo. 1982) (en banc)); *see also Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo. 1987) (en banc) (if a plaintiff fails to prove a breach of contract claim, he or she may nevertheless be able to recover on a promissory estoppel claim).

The elements of a promissory estoppel claim are: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the promise would induce action or forbearance by the promise; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice. *Marquardt*, 200 P.3d at 1129 (citing *Nelson*, 908 P.2d at 110). Whether the elements of promissory estoppel have been proved generally presents a question of fact. *See Alexander v. McClellan*, 56 P.3d 102, 106 (Colo. App. 2002).

Here, Defendants argue Plaintiff's claim fails because the evidence reflects (1) Zabors always intended to fulfill his promise, but Plaintiff left before it was finalized; (2) any promise for equity interest in the company is barred by the Operating Agreement, Washington corporate law, and the statute of frauds; (3) any promise made by Zabors was too indefinite to be enforceable; and (4) Plaintiff has no damages because he received a salary and benefits for his work. Plaintiff counters that the promises on which his claim are based do not relate solely to Enovation itself, but to a partnership in general, and the finality of the promise was delayed by Zabors' alleged improper conduct.

The Court finds there exist genuine issues of fact concerning whether Plaintiff reasonably relied on Zabors' promise to form a partnership to his detriment. First, the evidence reflects Zabors may have made an enforceable promise to form a partnership with Plaintiff. A promise is "a

manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1). "A promise may be stated in words ... or may be inferred wholly or partly from conduct." *Id.* § 4. But it must be "clear and unambiguous." *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994). It must also be sufficiently specific to allow a court to understand the nature of the obligation. *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1199 (Colo. App. 1997) (citing *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 620 (Colo. App. 1997)).

The evidence here reflects that Zabors considered Plaintiff a "partner" or "lead partner" at Enovation and referred to him as such to third parties throughout the year-long period Plaintiff worked there; Zabors and Plaintiff periodically met with other "partners" of the company to discuss corporate issues, including the implementation of an equity allocation plan; and Zabors engaged in continuous communications with Plaintiff in an effort to negotiate and finalize the equity plan. The Court finds that a reasonable juror could conclude, based on Zabors' words and conduct, that Zabors made a promise to Plaintiff to form a partnership with him and other individuals in 2013-2014.

Defendants claim such promise is not sufficiently definite for judicial review; the Court disagrees. The communications between Zabors and Plaintiff demonstrate they both intended to combine resources (including expertise, time, and money) to form a partnership for the purpose of establishing and generating a for-profit business providing energy consulting services.[6] Defendants also assert that the evidence shows Zabors' promise related to "future events" and Zabors always intended to fulfill the promise. However, the evidence also reflects that more than a year elapsed

---

[6] Again, Plaintiff alleges Zabors did not "hold up" his end of the bargain while the Plaintiff contributed expertise and time – arguably in exchange for a salary and benefits – but also profits from his own clients developed through his own business, ION, which was not contemplated by the employment arrangement.

during which the promise was not fulfilled, and a reasonable juror could conclude that such delay and Zabors' conduct during that time was not performed in good faith and negates Zabors' stated intent.

Finally, Defendants contend that a promise for equity in Enovation Partners LLC is barred by the company's Operating Agreement, Washington corporate law, and the statute of frauds. However, the evidence demonstrates that the promise at issue here was not made at a time when Enovation LLC existed; rather, the promise involved the formation of Enovation and, thus, Defendants arguments in this regard fail.[7]

Second and third, the evidence reflects factual issues as to whether Zabors should have reasonably expected that his promise would induce action by Plaintiff, and as to whether Plaintiff in fact reasonably relied on the promise to his detriment.  It is unrebutted that Plaintiff diverted the work he was doing for his clients at ION to Enovation during his employment there.  Whether Zabors expected Plaintiff to do so for the benefit of Enovation is a fact question.  So, too, is whether Plaintiff relied on this promise to his detriment; a reasonable juror could find that Plaintiff lost such business or profits to Enovation without the benefit of equitable allocation.  Fourth, if the Plaintiff did suffer such detriment, Zabors' promise must be enforced to prevent injustice.

Defendants argue that enforcement of Zabors' promise would mean simply that Plaintiff is only "entitled to his share of the profits and/or losses" from Enovation, and Plaintiff's choice to stay at Enovation for a year defeats any argument that he relied on Zabors' promises and demonstrates he failed to mitigate his damages.  The Court is not convinced that no factual issues exist.

Failure to mitigate damages is an affirmative defense which must be pled and proved by the

---

[7] "[Promissory estoppel] is often appropriate when parties have not mutually agreed on all the essential terms of a proposed transaction," *Kiely*, 670 P.2d at 767.

Defendants. *See Comfort Homes, Inc. v. Peterson*, 549 P.2d 1087, 1090 (Colo. App. 1976). "The defense applies when the plaintiff has failed to exercise reasonable care and diligence to minimize or lessen the resulting damages." *Martin v. Porak*, 638 P.2d 853, 855 (Colo. App. 1981) (citing *Powell v. Brady*, 496 P.2d 328, 331 (Colo. App. 1972), *aff'd sub nom., Brady v. City & Cnty. of Denver*, 508 P.2d 1254 (Colo. 1973). "[I]t is the duty of the injured party to take such reasonable steps as are within his power to reduce the damages which he has sustained, or to lessen or to avoid them as a reasonably prudent man would take in like circumstances." *Brenaman v. Willis*, 314 P.2d 691, 693 (Colo. 1957) (en banc) (citation omitted). Nonetheless, it is the choice of the Plaintiff, not the Defendants, as to which remedies the Plaintiff will seek. *See H & K Automotive Supply Co. v. Moore & Co.*, 657 P.2d 986, 988 (Colo. App. 1982) (citing *Altergott v. Yeager*, 543 P.2d 1293 (Colo. App. 1975) ("[T]he choice of remedies belongs to the one who has been defrauded, and may not be forced upon him by the wrongdoer.")).

Plaintiff attests that he stayed at Enovation as long as he did because he relied on Zabors' repeated promises to work to finalize the equity allocation for Enovation. Whether Plaintiff "reasonably" relied on such promises and whether he acted "reasonably" in doing so are material issues to be resolved by a fact finder. *See Hoff v. Indus. Claims Appeals Office*, -- P.3d --, 2014 WL 5034507, at *8 (Colo. App. Oct. 9, 2014). In addition, to the extent Zabors is found to have breached his promise, Plaintiff is entitled to recover "damages directly resulting from [his] reasonable and justifiable reliance upon the promises by" Zabors. *Snow Basin Ltd. v. Boettcher & Co., Inc.*, 805 P.2d 1151, 1155 (Colo. App. 1990).

The Court concludes that the Plaintiff has demonstrated genuine issues of fact supporting his promissory estoppel claim, which must be determined by a fact finder. Consequently, the Court will deny Defendants' motion for summary judgment in its favor on Plaintiff's third claim for relief.

D.     Unjust Enrichment

"Unjust enrichment is a form of contract, or quasi-contract, implied by law that does not rely upon a promise between parties." *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009). The elements of unjust enrichment are: (1) at the expense of a plaintiff; (2) a defendant received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it. *Id.* (citing *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008)). "It is a form of restitution designed to restore the plaintiff to his or her prior status." *Id.*(citing Restatement (First) of Restitution § 1 (1937)). "If the elements of unjust enrichment are proved, the defendant who received the benefit is normally required to make restitution to the plaintiff in the amount of the enrichment the defendant received." *Id.*

Unjust enrichment may be appropriate when "[t]he defendant's wrongful act may be a common-law tort, such as conversion of personal property or trespass to land, or it may be an equitable wrong such as breach of trust or other fiduciary obligation." *Id.* at 1205-06 (citing 1 Palmer, § 2. 1, at 50 and *DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 122 (Colo. 1998) (for a landlord's retention of a benefit to be unjust, there must be "some type of improper, deceitful, or misleading conduct by the landlord")). Thus, "[u]njust enrichment requires some form of misconduct by [Defendants], such as fraud, coercion, or a clear act of bad faith." *Id.* at 1206.

Defendants contend that Plaintiff fails to allege or demonstrate that Zabors engaged in "bad faith" or any other misconduct as required for an unjust enrichment claim. While true that Plaintiff's alleged claim in the Complaint does not identify improper conduct on the part of Zabors, he argues that the evidence reflects:

> It was a result of Zabors' attempts to change the equitable ownership scheme that this element of the partnership [equity allocation] was not finally decided in a fair and equitable manner. In the meantime, Zabors and Enovation took full advantage of more than $400,000 of client revenues and consulting expertise given to the

partnership by Plaintiff based upon Zabors' promises.

Response, docket #44 at 20.  As set forth above, Plaintiff has provided evidence raising factual issues as to whether Zabors promised to work on an equity allocation within a certain time frame, proposed equity plans very different from that to which he originally agreed, and unduly delayed completion of an equity plan while Plaintiff diverted his ION clients to Enovation.  The Court concludes that a fact finder must determine whether Zabors' conduct constitutes "bad faith" for purposes of Plaintiff's unjust enrichment claim and, thus, will deny Defendants' motion for summary judgment in its favor on Plaintiff's fourth claim for relief.

## II.    Defendants' Counterclaims

On December 10, 2015, the Court granted Defendants leave to file an Amended Answer and Counterclaims against Plaintiff, including claims for misappropriation of trade secrets, breach of fiduciary duty, and conversion.  First Amended Answer ("FAA"), docket #39.  Plaintiff argues that the first and third counterclaims fail as a matter of law because he was entitled to have the information regarding Enovation, his only use of any documents related to Enovation was in furtherance of Enovation's business, and any knowledge and expertise he brought to Enovation belongs to him.  In addition, Plaintiff contends that Defendants fail to identify any trade secrets or other information he allegedly took or used, and they fail to show that he competed or prepared to compete with Enovation for the second fiduciary duty counterclaim.

Defendants counter that they learned through discovery that Plaintiff retained most, if not all, of his email files and electronic documents after his separation from Enovation and neither returned nor destroyed such files and documents containing trade secrets and proprietary information.  Further, Plaintiff never resigned nor disassociated himself from his business, ION,

which competes in the same industry with Enovation.[8]  Plaintiff replies that the evidence does not demonstrate he "acquired" any "trade secrets by improper means," or "improperly disclosed" any confidential information; misappropriation and conversion require more than just being in possession of documents and information; and Plaintiff's only motivation to "run business through ION" was to work collaboratively with Enovation.

> A.   Misappropriation of Trade Secrets

Defendants allege that Plaintiff "copied most, if not all, of his Enovation email file, which included the Sensitive Information" which they describe as "its customer base, vendors, rates, pricing, margins, marketing, research, and strategy information and presentations." FAA, ¶¶ 11, 62. They further allege that "[s]ince resigning from Enovation and copying the Sensitive Information, [Plaintiff] has continued to own and work for Ion" and Plaintiff "cannot serve as an owner of Ion without utilizing and disclosing Enovation's trade secrets and confidential information." *Id.*, ¶¶ 63, 66.

Plaintiff argues that the evidence demonstrates Defendants have not identified any trade secrets he allegedly "misappropriated," and he neither took nor used any information which he was not entitled to possess as a "partner" with Enovation.

"[A]ctions for damages or injunctive relief from the misappropriation of trade secrets are governed by statute." *Gognat v. Ellsworth*, 259 P.3d 497, 500 (Colo. 2011) (en banc) (citing Colo.

---

[8]Defendants contend that further discovery is necessary to support their counterclaims and state "[s]hould the stay be lifted, Defendants are entitled to discovery to support its [sic] counterclaims." Response, docket #50 at 20.  However, Fed. R. Civ. P. 56(d) requires a motion supported by an affidavit or declaration, and the Court will not consider any motion raised in a response or reply brief.  *See* D.C. Colo. LCivR 7.1(d).  Notably, Defendants also assert that "Plaintiff's written discovery responses and deposition testimony provide more than sufficient evidence to support Defendants' counterclaims beyond summary judgment."  Docket #50 at 21.

Rev. Stat. §§ 7-74-101 to -110 ("Uniform Trade Secrets Act")).[9]

> "Misappropriation" is defined broadly to include the "acquisition" of a trade secret by anyone who has reason to know it was acquired by improper means, as well as the "disclosure" or "use" of a trade secret without consent by anyone who acquired it improperly or had reason to know that his knowledge of it came from someone who got it improperly or under circumstances giving rise to a duty to either keep it secret or limit its use. See § 7-74-102(2). "Trade secret" is defined equally broadly to include all or part of virtually any information that is of value, whether it be in the nature of scientific, technical, business, financial, or professional information, as long as the owner has taken measures to prevent it from becoming available beyond those to whom he has given limited access. See § 7-74-102(4).

*Id.* at 500-01. "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Colo. Rev. Stat. § 7-74-102(1).

"The interpretation of the statutory definition, and therefore the scope, of a 'trade secret,' . . . is a question of law for the court." *Id.* at 502 (citing *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 641 (Colo. 1988) (en banc)). "Although an exact definition of a trade secret may not be possible, the following factors may be considered in the determination whether a trade secret exists:

1) the extent to which the information is known outside the business;

2) the extent to which it is known to those inside the business, i.e., by the employees;

3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

4) the savings effected and the value to the holder in having the information as against competitors;

5) the amount of effort or money expended in obtaining and developing the information; and

---

[9]Defendants "dispute that Colorado law applies to claims governing a Washington limited liability company" but, other than make this assertion, they do not argue the application of any particular law, and they support their response with citations to Colorado law. *See* Response, docket #50.

6) the amount of time and expense it would take for others to acquire and duplicate the information."

*Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 521-22 (Colo. App. 2011); *see also Colo. Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990).

Defendants contend that "what constitutes a trade secret is ultimately a question of fact for the trial court." Response, docket #50 at 12. Assuming for purposes of this analysis the Defendants' contention to be true for the documents identified here, the Court notes Defendants also argue that their claim "survives" pursuant to Colo. Rev. Stat. § 7-74-102(2)(a), which provides: "'Misappropriation' means: Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." With respect to the alleged "misappropriation" by Plaintiff, Defendants proffer three "means" by which Plaintiff acquired the trade secrets: (1) deleted client information from Enovation's shared drive; (2) downloaded and continued to possess Enovation emails and attachments; and (3) failed to return materials designated as "property of Enovation." Response, docket #50 at 15-16. Importantly, Defendants do not identify how any of Enovation's trade secrets were acquired by Plaintiff or "another" by "improper means."

It does not appear that Defendants accuse Plaintiff of "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *See* Colo. Rev. Stat. § 7-74-102(1). However, to the extent they suggest that Plaintiff "took" Enovation property without permission, the evidence they point to fails to raise any factual issues. For example, Defendants contend that Plaintiff's testimony demonstrates he "improperly" deleted sensitive client information from Enovation's shared drive. However, Plaintiff testified that he "save[d] information relating to [his] Quanta business to that shared drive ... as a conveyance

mechanism to share some larger files ... with other members of Enovation" and later "delete[d] those files ... [b]ecause it was sensitive client information related to a contract ... and Enovation had other people working on a competitor to Quanta, and I saw some information that some junior members had used, and I did not think that was appropriate, so I deleted it."  Walshe depo: 102: 7-25, 103: 1-20.  In addition, Plaintiff attested that he raised the "issue about the treatment [deletion] of Quanta-related information" to Dan Gabaldon, who is a member of Enovation, LLC, and "Ken-Ichi."  *Id.*, 103: 21-25, 104: 1-7.  Further, Defendants argue that Plaintiff "admitted to deleting a PowerPoint presentation that was utilized for Quanta related business."  However, the testimony to which they cite provides in its entirety:

Q.     Was this one of the documents that was on the shared drive, if you can recall?

A.     I don't know. Could be.

Q.     You don't know for sure, though?

A.     Don't know. I think it is.

*Id.*, 159: 5-9.  Defendants provide no context for this testimony, including any identification of the document discussed and whether Plaintiff and defense counsel were discussing documents simply saved to the shared drive or those that were deleted.  Accordingly, no reasonable fact finder could conclude that this testimony raises factual issues as to whether Plaintiff misappropriated information by deleting it under § 7-74-102(2)(a).

In addition, Defendants argue that Plaintiff "download[ed] and continu[ed] to possess emails and attachments sent to his Enovation work email."  Response, docket #50 at 15.  They produce no evidence nor argument demonstrating they believe Plaintiff downloaded, or may have downloaded, emails and/or attachments after his employment with Enovation ended.  *See id.* at 15 ("Plaintiff produced approximately 6,134 electronic files through discovery that are the property of Enovation,

which Enovation did not know *remained* in Plaintiff's possession until this litigation.") (emphasis added).  Thus, Defendants argue that Plaintiff continued to possess or failed to return, after his employment separation, information and/or documents Defendants characterize as "trade secrets."  However, again, they point to no evidence demonstrating factual issues as to Plaintiff's acquisition by improper means.

Defendants contend that Plaintiff "testified that he did not return materials relating to section 111(d) of the EPA's Clean Air Act to Enovation Partners which explicitly stated '[i]t remains the property of Enovation.'" Response, docket #50 at 16.  The 20-page document to which Defendants cite is titled, "Strategy Development for E-P-C Sector," and notes that it is "private and confidential intended solely for the use of our clients."  Docket #50-10.  Notably, the document was not filed under restriction from public access pursuant to D.C. Colo. LCivR 7.2.  Nevertheless, there is nothing on this document "explicitly stating 'it remains the property of Enovation.'" *See id.* Defendants also cite Plaintiff's testimony, which appears to refer to a different document:

Q. So what was the context of this letter?

A. This is a letter that the partners sent to me.

Q. Did you respond via yourself or through counsel to dispute that somebody had accepted a letter of resignation dated October 21st, 2014?

A. I didn't -- I don't think I responded to this letter. We were already in a state of dispute.

Q. And the third paragraph down, the last sentence, it says, "And we apologize for the initial coding of your resignation dated September 30"; do you see that?

A. Yes.

Q. And then the fourth paragraph down, "Industry Insights" -- I'm sorry, the fifth paragraph down that starts with "Industry Insights," do you see that?

A. Yes.

Q. Did you return all of the materials relating to 111(d) to Enovation Partners?

MR. LEFFERT: Well, objection. That doesn't request a return.

A. Exactly. Nobody ever asked me to return anything.

Q. (By Mr. Walker) It says, "It remains the property of Enovation"; is that correct?

MR. LEFFERT: Right.

A. That's what it says.

Q. (By Mr. Walker) Did you return any of the property relating to 111(d) in your possession?

A. Nobody ever asked me to return anything.

Q. I'm not asking if they asked you to do it. Did you ever return it?

A. I had no reason to return it, so no, I did not return anything.

Q. Why did you have no reason to return it?

A. Because nobody asked me to return anything.

Walshe depo: 212: 6-25, 213: 1-20.  Plaintiff provided the next page of the deposition, which continues his testimony on this subject:

Q. The written work or spreadsheets related to 111(d) or other topics developed by the team at Enovation, is that your property?

A.  There was minimal information -- there was -- I don't know what specifically this refers to.  I don't know the spreadsheet or the written work product that it refers to. As I said, it was the biggest issue in the industry. Everybody was talking about it.  It doesn't make any request for me to return anything, and there was nothing specific that I could even think of that they're referring to.

*Id.*, 214: 2-13, docket #52-1.  Neither party provided a copy of the "letter" discussed during this

portion of the deposition.  The Court finds that no reasonable fact finder could, based on this evidence, conclude Plaintiff acquired work related to 111(d) by improper means.

However, Defendants claim Plaintiff improperly retained confidential information and emails, including internal financial information and other documents marked, "Confidential and Privileged," and he "cannot serve as an owner of Ion without utilizing and disclosing Enovation's trade secrets and confidential information."  This argument implicates the other method by which a trade secret may be appropriated, found at Colo. Rev. Stat. §7-74-102(2)(b), which provides:

> (2) "Misappropriation" means:
> ...
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (I) Used improper means to acquire knowledge of the trade secret; or
>
> (II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:
>
> (A) Derived from or through a person who had utilized improper means to acquire it;
>
> (B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (III) Before a material change of such person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Neither Defendants' arguments nor evidence support claims under §§ 7-74-102(b)(I) or (III). Further, there is nothing indicating Defendants claim Plaintiff obtained knowledge of Enovation's confidential information improperly through a third person, as required in subsections 102(b)(II)(A) and (C). Therefore, the Court construes Defendants' argument as brought pursuant to subsection

102(b)(II)(B): Plaintiff acquired Enovation's confidential information and/or documents "under circumstances giving rise to a duty to maintain [their] secrecy or limit [their] use," but disclosed or used them without permission.

It is undisputed that the documents cited are marked "confidential" and/or appear to be internal financial information for Enovation, and the circumstances indicate Plaintiff had access to such documents and information as a "Director" at Enovation.  Remaining, then, is whether there exist factual issues concerning whether Plaintiff used or disclosed Enovation's confidential information.

Defendants contend that Plaintiff "cannot serve as an owner of Ion [a competitor with Enovation] without utilizing and disclosing Enovation's trade secrets" and argue the evidence demonstrates Plaintiff never resigned from nor sold ION during his employment (Walshe depo, 59: 16-25, 60: 1-23); he expressed a desire to resign from Enovation as early as July 2014 (Complaint, ¶ 16); he submitted no billable timesheets for Enovation July - September 2014 (Walshe depo: 51: 15-20); as part of his resignation on October 2, 2014, Plaintiff indicated that all future revenue originating from his work would be billed through ION, and he asked that revenue generated from Quanta work be "reverted" back to ION, minus subcontractor or travel expenses paid by Enovation (docket #48-5); and upon his resignation, Plaintiff "told all of the Directors and Principals of the firm, at the end of the compensation planning meeting, that he planned to almost immediately begin competing with Enovation through Ion, and would use confidential and proprietary information developed at Enovation to procure business for Ion" (Declaration of Robert Zabors, March 15, 2016 ("Zabors Declaration"), ¶ 22, docket #50-1.).

In response, Plaintiff attests that "ION did not generate any billable client revenues, and [Plaintiff] did not receive any income from ION during the time that [he] was affiliated with

Enovation" (Affidavit of Brian Walshe, February 23, 2016 ("Walshe Affidavit"), ¶ 18, docket #52-3); he "did not conduct any business through ION" (*id.*); he "never took or stole any information, confidential or otherwise, belonging to or developed through Enovation" (*id.* at ¶ 20); he "never used any information, confidential or otherwise, belonging to or developed through Enovation, in [his] work for ION" (*id.* at ¶ 21); he "did not download or otherwise take any information or documentation belonging to Enovation to compete against it" (*id.* at ¶ 22); and "[s]ince leaving the Partnership, [he has] mainly focused [his] professional business in an area unrelated to Enovation's area of practice" (*id.* at ¶ 24).

The Court finds this evidence raises factual issues as to whether Plaintiff used or disclosed alleged confidential information he acquired under circumstances giving rise to a duty to maintain secrecy or limit the use of such information. Such issues may not be resolved pursuant to Rule 56.

Plaintiff replies (and the Court now suspends its assumption) that the documents to which Defendants cite (their Exhibits H, I, J and K) are not, and do not contain, "trade secrets" pursuant to the statute. For example, Plaintiff asserts that Exhibit H, titled, "Summary of Firm Financials,"is "a 4-page PowerPoint file with high level financial metrics for Enovation that [he] received by email." Reply, docket #52 at 6. The exhibit reflects that the summary was emailed to persons all identified herein as "partners" or "employees" of Enovation. Docket #50-8. In addition, the document is marked "privileged and confidential - not for distribution." *Id.* Plaintiff contends, "There are no references to any clients or services provided by Enovation, it has no competitive value to anyone, and [he] has not used this file or done anything with it since leaving Enovation." Docket #52 at 6. However, a "trade secret" under the statute may include "confidential business or financial information" (Colo. Rev. Stat. § 7-74-102(4)), and the document and its delivery indicates that Enovation "took measures to prevent the [document] from becoming available to persons other

than those selected to have access" to the document (*id.*).  Consequently, a reasonable fact finder could conclude that Exhibit H constitutes a "trade secret" under the statute.

Regarding Exhibit I, Plaintiff contends the document "is an agenda for a sales call regarding a proposal for a client, Sumitomo, that [he] received from another partner with Enovation, Todd Allmendinger."  Reply, docket #52 at 7; *see also* docket #50-9.  Plaintiff submits a copy of an email to which Exhibit I apparently was attached.  Docket #52-4.  The email message reflects that Mr. Allmendinger first sent an attached "discussion document" to several persons at "sumitomocorp.com" informing them, "in the workshop we will focus on the first two sections - Summary and Action Plan."  *Id.*  Notably, Exhibit I does not contain sections titled, "Summary and Action Plan."  *See* docket #50-9.  Mr. Allmendinger next forwarded the first email and attachment to persons located at "gastechnology.org" and "enovationpartners.com," including the Plaintiff.  Docket #52-4.  Here, the Plaintiff contends that the "file was sent to seven people ... including Brad Bodwell, who was not an employee of Enovation[;] thus it was not a secret."  Docket #52 at 7.  However, Mr. Bodwell's email address, as reflected on the message, is "bbodwell@enovationpartners.com."  Docket #52-4.  Plaintiff does not explain this incongruity.  Moreover, to the extent Plaintiff argues that information is never a "trade secret" if disclosed to third parties, the Court notes that "'the necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another' – such as a licensee or customer – 'in confidence, and under an implied obligation not to use or disclose it.'"  *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, No. 10-cv-02868-MSK, 2013 WL 5437775, at *5 (D. Colo. Sept. 27, 2013) (quoting *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974)); *see also L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1181 (D. Colo. 2015) ("there are genuine disputes of material fact as to whether L-3 forfeited trade secret protection for most of its testing equipment,

procedures, and software in the course of disclosing those matters to customers"). On this evidence, the Court cannot summarily conclude Exhibit I is not a trade secret.

Plaintiff asserts he created Exhibit J "for a sales call with a potential client, Enerfab, in September 2014" and it "contains discussion and analysis of industry trends, almost all of which are sourced to publicly available information, mainly relating to the potential impact of a proposed change to EPA Regulation 111(d)." Docket #52 at 7. Plaintiff contends that "[a]s the subject of public industry speculation and discussion, these materials were not secret or proprietary to Enovation, and as the actual final EPA changes to Rule 111(d) were announced in the summer of 2015 and were different from the proposed Rule 111(d) analyzed in Exhibit J, any previous speculation on what the final rule might be is by definition obsolete and cannot be a trade secret." *Id.* Plaintiff points to his own deposition testimony in which he attested that "111(d) was one of the biggest issues in our industry, so ... everyone was constantly talking about that, inside and outside of Enovation." *Id.* However, such testimony is insufficient to support a finding under Rule 56 that Exhibit J, marked as confidential and prepared by Plaintiff during his employment with Enovation for purposes of conducting Enovation's business, does not contain trade secret information. Such finding must be made by a fact finder.

Finally, Plaintiff describes Exhibit K as "a 2-page spreadsheet model describing a power plant, which was sent by email from another partner of Enovation, Eric Powell, to Walshe and three other non-employees of Enovation for the purpose of soliciting new business from a potential client." Docket #52 at 8. Plaintiff argues, "[a]s the email containing the document was sent to non-employees, it was not a secret, and again, [he] has not disclosed, used, or done anything with the document." *Id.* Notably, Exhibit K is not marked, "confidential," and the only reference to the document by Defendants in their brief is to describe the document as "costing information" in listing

the types of "trade secrets" received by Plaintiff.  Docket #50 at 13.  Unlike the other documents cited by Defendants, there appears to be no indication that Enovation took measures to keep the information contained in Exhibit K confidential.  Moreover, costing and pricing information are not automatically considered "trade secrets."  *See Stewart*, 797 P.2d at 1306; *Porter Indus., Inc. v. Higgins*, 680 P.2d 1339, 1342 (Colo. App. 1984).  The Court concludes that a reasonable fact finder could not find Exhibit K to contain a "trade secret" under the statute.

In sum, the Court finds Defendants raise genuine issues of material fact as to whether Plaintiff used or disclosed Exhibits H, I, and/or J, which may be determined "trade secrets," without permission and, thus, the Court will deny in part the Plaintiff's motion for summary judgment as to the first counterclaim.

B.     Conversion

Because the third counterclaim for relief involves the same or similar allegations concerning the first counterclaim, the Court will analyze this claim next.  Defendants allege, in pertinent part:

83.    Based on conduct independent of the existence, knowledge, misappropriation, and usages of Enovation's Sensitive Information, Mr. Walshe removed and retained non-Sensitive Information and non-trade secret information, but still confidential and proprietary information, including the emails and other Enovation documents that do not qualify as trade-secrets.

84.    Upon information and belief, such non-trade secret, but confidential and proprietary information, was intentionally retained, downloaded or used for Mr. Walshe's own economic advantage, or for the benefit of Ion to compete with Enovation.

FAA, docket #39.

"Conversion is 'any distinct, unauthorized act of dominion or ownership exercised by one

person over personal property belonging to another.'" *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. App. 2008) (quoting *Glenn Arms Assocs. v. Century Mortg. & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984)). "Where there is a wrongful taking, the tort of conversion is complete upon that taking; the victim does not have to demand return of the goods nor does the wrongdoer have to refuse such a demand." *Montgomery Ward & Co., Inc. v. Andrews*, 736 P.2d 40, 46 (Colo. App. 1987) (citing *Colorado Kenworth Corp. v. Whitworth*, 357 P.2d 626 (Colo. 1960)).

For substantially the same reasons set forth in section II.A., the Court finds that material factual issues – concerning whether electronic files, including Exhibits H-K, "belong" to Enovation and whether Plaintiff wrongfully "retained" them – preclude the entry of summary judgment.

C.  Breach of Fiduciary Duty

Defendants allege that, based on his employment relationship with Enovation, Plaintiff "breached his fiduciary duties to Enovation by, among other things, continuing to own and work for a competitor, Ion, while employed by Enovation, receiving compensation from Ion for his work, and retaining trade secrets and confidential information owned by Enovation, for his own pecuniary benefit or the benefit of Ion." FAA, ¶ 79. Plaintiff argues the facts demonstrate he "did not ever compete, prepare to compete, or take any other actions that could be construed as disloyal to Enovation" and, thus, summary judgment is proper on this claim.

"[I]n Colorado, there exists simply a duty of loyalty arising out of the employer-employee relationship." *Lucht's Concrete Pumping, Inc. v. Horner*, 224 P.3d 355, 360 (Colo. App. 2009), *rev'd on other grounds by* 255 P.3d 1058 (Colo. 2011). "[T]he duty of loyalty that an employee owes his or her employer is largely derived from Restatement (Second) of Agency § 387 (1958)" (*id.* citing *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 492 (Colo. 1989)), which "states that 'an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters

36

connected with his agency.' It follows that an agent has a corresponding duty 'not to compete with the principal concerning the subject matter of his agency.'" *Id.*

Here, the Court finds it is undisputed that Plaintiff, as a Director of Enovation, owed the company a duty of loyalty.  *See Horner*, 224 P.3d at 361; *Mulei*, 771 P.2d at 492.  However, "whether an employee's actions constitute a breach of his duty of loyalty involves a question of fact to be determined by the trial court in the first instance based on a consideration of all the circumstances of the case." *Mulei*, 771 P.2d at 494.  Defendants assert that factual issues exist demonstrating Plaintiff "acted in his own interest by: (1) not resigning, selling, registering ION as an inactive entity, or otherwise disassociating himself from Ion; (2) attributing billable hours during his Enovation employment to Ion; and (3) deleting information from Enovation's shared Google drive."  Response, docket #50 at 17.

The evidence reflects Zabors' declaration that some time after he founded Enovation in May 2013, he "knew Mr. Walshe had his own consulting firm, ION Consulting" and "[b]ased on our discussions, it was my understanding that Mr. Walshe would resign, sell, or otherwise disassociate himself from or with Ion if he were to join Enovation."  Zabors' Declaration, ¶ 6, docket #50-1. Plaintiff testified that ION "still existed from 2013 to 2014" (Walshe depo: 60: 12-14); "from a tax and legal perspective, [ION] was not inactive" (*id.*, 60: 15-21); although Plaintiff was being paid at Enovation, there was no client billable work from July through September 2014 (*id.*, 86: 16-24); and in October 2014, he suggested that Quanta-related "revenue should be reverted back to ION Consulting (minus any subcontractor or travel expenses paid by Enovation)" (docket #50-6).

In addition, Plaintiff attests that Zabors "solicited and encouraged [him] to join Enovation and Zabors as a partner and to transfer current client work of ION to Enovation" (Walshe Affidavit, ¶ 4, docket #52-3); "[i]mmediately after joining the Partnership, [he] began transferring [his] client

work and revenue from ION to Enovation" (*id.*, ¶ 8); he "introduced Zabors and other Partners to

ION's long-term clients and told those clients that moving forward, [he] would be a partner at

Enovation and ION's ongoing client work would now be billed through Enovation" (*id.*, ¶ 13); and:

> ION did not generate any billable client revenues, and I did not receive any income
> from ION during the time that I was affiliated with Enovation. While ION continued
> to exist technically as a legal entity, I did not conduct any business through ION.
> ION did not have any employees during the time I was affiliated with Enovation and
> the Partnership. The only reason a tax return was filed for ION for the calendar year
> 2014 was for minor expenses related to administrative items such as a refund of a
> pre-paid insurance premium.

(*id.*, ¶ 18).  Based on this evidence, the Court finds factual issues exist as to whether Plaintiff "acted

solely for the benefit of [Enovation] in all matters connected with his employment" by keeping ION

as an active company during his employment with Enovation and by performing no billable work

but receiving pay during the period July - September 2014.  Otherwise, the evidence demonstrates

no factual issues and the Court will grant summary judgment in Plaintiff's favor on the remainder

of the claim.

## CONCLUSION

For the foregoing reasons and based on the record herein, the Court finds Defendants have

shown no genuine issues of material fact exist with respect to Plaintiff's breach of partnership

agreement claim (except for Plaintiff's allegations concerning business expense reimbursement) and

breach of fiduciary duty claim; however, factual issues must proceed to trial on Plaintiff's

promissory estoppel and unjust enrichment claims.  In addition, the Court concludes Plaintiff has

demonstrated no genuine issues of material fact exist as to whether he acquired trade secrets by

improper means, but factual issues do exist as to whether he used or disclosed trade secrets, whether

he converted Enovation property to his own use, and whether he breached a duty of loyalty to

Enovation.

Accordingly, the Defendants' Motion for Summary Judgment [filed December 31, 2015; docket #41] and Plaintiff's Motion for Summary Judgment [filed February 23, 2016; docket #48] are **granted in part and denied in part** as follows:

1.   Plaintiff's first claim for relief, to the extent it alleges Defendants breached an agreement to pay Plaintiff's business-related expenses, will proceed to trial;

2.   The remainder of Plaintiff's first claim for relief and his second claim for relief are dismissed with prejudice;

3.   Factual issues exist regarding Plaintiff's third claim for relief concerning whether Plaintiff reasonably relied on Zabors' promise to form a partnership to his detriment;

4.   Factual issues exist regarding Plaintiff's fourth claim for relief concerning whether Zabors' conduct constitutes "bad faith";

5.   Factual issues exist regarding Defendants' first counterclaim concerning whether Plaintiff used or disclosed without permission Exhibits H, I, and/or J, which may be determined "trade secrets";

6.   Factual issues exist regarding Defendants' second counterclaim concerning whether Plaintiff acted solely for the benefit of Enovation by keeping ION as an active company during his employment with Enovation and by performing no billable work but receiving pay during the period July - September 2014; and

7.   Factual issues exist regarding Defendants' third counterclaim concerning whether electronic files, including Exhibits H-K, belong to Enovation and whether Plaintiff wrongfully retained them.

In addition, the Court **lifts** the temporary stay of discovery; if the parties believe additional time is necessary to complete discovery in this case, they may file an appropriate motion.

Entered and dated at Denver, Colorado, this 18th day of April, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge