IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01218-MEH

BRIAN F. WALSHE,

       Plaintiff,

v.

ROBERT ZABORS, and
ENOVATION PARTNERS, LLC,

       Defendants.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

       The Court held a trial to the bench in this matter on January 17-19, 2017, and took the matters under advisement. A transcript of the proceeding was prepared and filed on February 13, 2017. ECF Nos. 96–98.

## I.      Background

       Defendant Enovation Partners LLC ("Enovation") was founded in July 2013 with three members: Defendant Robert Zabors ("Zabors"), Jeffrey Clark, and GTI International ("GTI"), a non-voting corporate member.[1] Essentially, Enovation provides consulting services to utility companies to devise and develop strategies for energy generation.

       At all relevant times, Enovation was governed by the July 1, 2013 Operating Agreement and

---

[1]The copy of the July 1, 2013 Operating Agreement admitted in evidence does not contain a signature from a GTI representative (*see* Ex. 7); however, the December 30, 2013 Amended Operating Agreement provides, "WHEREAS, the Members entered into an Operating Agreement dated as of July 1, 2013, with respect to the Company . . . ." Ex. 10.

the December 30, 2013 Amended Operating Agreement, which identify the members of the LLC and dictate how profits and losses are shared and distributed among the members.  Plaintiff Brian Walshe ("Walshe") was never a member of Enovation.

Zabors and Walshe met in early 2013 when Walshe worked as a subcontractor on Zabors' project during Zabors' previous employment.  Zabors discussed with Walshe his idea to form Enovation; these discussions continued for several months.  Then, on September 11, 2013, Zabors emailed to Walshe a "draft" employment offer letter with a message, "basic document for discussion."   The letter included a proposed "base salary draw," "additional compensation potential," and "equity."  *Id.*  Walshe never signed the letter but joined Enovation as an employee on October 1, 2013.

Walshe has been the owner of a company called Altera Energy d/b/a ION Consulting ("ION") since its inception in 2010.  ION was neither merged with Enovation nor was rendered "inactive" (as that term is defined by the Colorado Secretary of State) during Walshe's employment with Enovation; however, Plaintiff transferred his clients and work from ION to Enovation.

On April 18, 2016, the Court issued an order granting in part and denying in part the parties' motions for summary judgment, which narrowed the issues of this case as follows.  Walshe alleges the Defendants breached an implied contract by failing to reimburse him for business-related expenses he incurred while employed at Enovation; the Defendants are promissorily estopped from treating him as an "employee" rather than a "partner" of Enovation entitled to compensation over and above his salary and benefits; and, Defendants were unjustly enriched by receiving the benefits (revenues) from his "large" client, who Walshe transferred to Enovation, and by engaging in bad faith in delaying the consummation of an equity agreement for more than a year while Walshe

2

generated revenues for Enovation.

Defendants counter by claiming that Walshe used or disclosed without Enovation's permission certain confidential information belonging to Enovation; breached a fiduciary duty by keeping ION as an active company during his employment with Enovation; and wrongfully retained information and documents belonging to Enovation.

## II.   Analysis

The issues presented for the Court's determination at trial were:

1.   Whether Plaintiff proved by a preponderance of the evidence that Defendants breached an agreement to pay Plaintiff's business-related expenses;

2.   Whether Plaintiff proved by a preponderance of the evidence he reasonably relied on Zabors' promise of compensation over and above his salary and benefits to his detriment;

3.   Whether Plaintiff proved by a preponderance of the evidence that Zabors' conduct constitutes "bad faith" for purposes of his unjust enrichment claim;

4.   Whether Defendants proved by a preponderance of the evidence that Plaintiff used or disclosed without permission Exhibits H, I, and/or J, which may be determined "trade secrets";

5.   Whether Defendants proved by a preponderance of the evidence that Plaintiff acted solely for the benefit of Enovation by keeping ION as an active company during his employment with Enovation and by performing no billable work but receiving pay during the period July - September 2014; and

6.   Whether Defendants proved by a preponderance of the evidence that electronic files, including Exhibits H-K, belong to Enovation and whether Plaintiff wrongfully retained them.

The Court will address each claim and counterclaim in turn.

       A.      <u>Breach of Contract for Business-Related Expenses against Defendants</u>

A contract is formed when an offer is made and accepted, and the agreement is supported by consideration. *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008).  Acceptance of an offer is generally defined as words or conduct that, when objectively viewed, manifest an intent to accept an offer. *Id.*  A person who, with knowledge of an offer's terms, voluntarily takes the benefits of the offered services without objection is deemed to have accepted the offer and formed a contract. Restatement (Second), Contracts § 69.

Colorado recognizes the existence of a contract implied from the conduct of the parties. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986) (en banc); *Fair v. Red Lion Inn*, 920 P.2d 820, 825 (Colo. App. 1995).  There must be a meeting of the minds as to the essential terms before any agreement will be implied. *See A.R.A. Mfg. Co. v. Cohen*, 654 P.2d 857, 859 (Colo. App. 1982); *see also Dunning v. Thomas*, 14 P. 49, 51 (Colo. 1887) ("An agreement is a meeting or accord of two or more minds as to a particular thing.").

The evidence at trial was undisputed that Zabors, Walshe, and other Enovation directors were expected, as part of their duties and responsibilities, to travel to meet with each other and with current and prospective clients.  In fact, a common provision in the employment offer letters from Enovation to prospective directors provides, "All expenses directly attributable to client engagements and corporate initiatives as well as a pro rata share of approved business development expenses will be reimbursed on a monthly basis per company policy and upon completion of the appropriate expense request form." *See* Exs. 2, 5.  Enovation created the form by which directors might seek reimbursement for travel expenses, such as airfare, hotel fees, transportation, and meals. Ex. 59.

At trial, Walshe proffered copies of time and expense reports he had submitted to Enovation in November 2014 totaling $10,869.40, and argued these expenses were generated during July, August, and September 2014 for business development on behalf of Enovation, but never reimbursed.  Tr. 252: 18-20; 380: 9-15.  The Court finds these expenses were incurred by Walshe during the relevant time and in furtherance of his duties as an Enovation "director" and for business development.  Defendants offered no persuasive evidence contradicting this finding.

Accordingly, the Court finds Walshe proved by a preponderance of the evidence that Defendants breached an agreement to reimburse his Enovation-related expenses totaling $10,869.40. *See* Ex. 43.  The Court will enter partial judgment in favor of Walshe on this claim.

B.      Promissory Estoppel against Defendants

Colorado has adopted the promissory estoppel doctrine as articulated in the Restatement (Second) of Contracts § 90(1):

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995) (en banc); *Kiely v. St. Germain*, 670 P.2d 764, 767 (Colo. 1983) (en banc). The doctrine "encourages fair dealing in business relationships and discourages conduct which unreasonably causes foreseeable economic loss because of action or inaction induced by a specific promise."  *Kiely*, 670 P.2d at 767.  "It provides relief to those harmed because they relied on another's promises, even without an enforceable contract." *G&A Land, LLC v. City of Brighton*, 233 P.3d 701, 703 (Colo. App. 2010) (citing *Vigoda v. Denver Urban Renewal Auth.*, 646 P.2d 900, 905 (Colo. 1982) (en banc)).

"[A]ny remedial order in cases involving claims based on promissory estoppel must be fashioned carefully to achieve fairness to all parties in the circumstances of the particular case."

*Kiely*, 670 P.2d at 767. "When injustice to a promisee who reasonably and justifiably relies on a promise can be prevented only by recognizing a right of recovery from the promisor, neither the lack of a written contract nor the absence of fraudulent conduct can defeat the claim for recompense." *Id.*; *see also Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo. 1987) (en banc) (if a plaintiff fails to prove a breach of contract claim, he or she may nevertheless be able to recover on a promissory estoppel claim).

The elements of a promissory estoppel claim are: (1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that the promise would induce action or forbearance by the promise; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice. *Marquardt*, 200 P.3d at 1129 (citing *Nelson*, 908 P.2d at 110). Whether the elements of promissory estoppel have been proved generally presents a question of fact. *See Alexander v. McClellan*, 56 P.3d 102, 106 (Colo. App. 2002).

### 1.     The Promisor Made a Promise to the Promisee

A promise is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1). "A promise may be stated in words ... or may be inferred wholly or partly from conduct." *Id.* § 4. But it must be "clear and unambiguous." *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994). It must also be sufficiently definite to allow a court to understand the nature of the obligation. *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1199 (Colo. App. 1997) (citing *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 620 (Colo. App. 1997)).

The evidence at trial demonstrated Zabors promised Walshe "something more" than his salary and benefits (i.e., compensation in the form of a distribution) in return for Walshe bringing

his client, Quanta, to Enovation.[2]  *See* Exs. 5, 12, 21, 26.  Walshe testified that during a meeting with Zabors in early 2013 (before he began employment with Enovation), Zabors expressed his interest in Quanta by asking Walshe "how big was it, how much revenue I got from there, how long, a lot of details about it, which made it clear to me that was one of the -- and I knew, that was one of the things I was bringing to the table was my 12-year relationship with-- with Quanta, which is one of the-- the bigger-- and may be the largest specialty electrical contractor in the United States."  Tr. 33: 15-25, 34: 1-15.  Zabors testified, in the context of offering employment to Walshe, that "Quanta would be a nice thing to move forward with."  Tr. 521: 2-13.

Walshe testified that he and Zabors had a face-to-face discussion in September 2013, before he started with Enovation, at which Walshe informed Zabors that, based on family medical expenses, "the salary draw [at Enovation] would not be nearly enough for me to pay my expenses, and I would need some kind of profit distribution on a quarterly, and I think we said or semi-annual basis."  Tr. 42: 4-14.  Walshe explained that he was drawing approximately $30,000/month salary at ION, so the $13,000/month salary draw at Enovation was insufficient.  *Id.* 42: 15-18.  Walshe stated that Zabors promised the formation of a final compensation structure by the end of 2013 (*id.* 48: 17-24) and the first distribution of such compensation no later than April 2014 "because a lot of us are probably going to be using this distribution to pay our 2013 salary -- income taxes."  *Id.* 51: 10-19.

On October 1, 2013, Walshe transferred all work, including that concerning his client,

---

[2]Although Walshe alleged in this case that he relied on a promise "to form a partnership," the Court finds the testimony and other evidence at trial reflected the parties' understanding that the "partners" at Enovation would receive compensation over and above salary and benefits, which distinguished them from other employees, including "principals."  *See* Ex. 8 (Zabors "totally agree[d]" with Walshe's description of the differences between "directors/partners" and "principals" at Enovation and his delineation of compensation for work "sold.").

Quanta, to Enovation, and his own company, ION, remained dormant (in a practical sense) during his employment at Enovation. Tr. 29: 2–22; 54: 1-6.

The proposed employment agreement Zabors presented to Walshe included a provision for "additional compensation potential," which referred to a "bonus." Ex. 5. Although it is undisputed that Walshe never signed the agreement, Zabors and Walshe proceeded with the intent that Walshe was "eligible for bonus compensation." *See* Exs. 20, 21; *see also* Ex. 29 (Zabors calculated a potential bonus for Walshe based on $300,000 in revenue minus salary and expenses totaling $60,000, which he "expect[ed] to be paid by end of July"); Ex. 31 (Zabors responded to Walshe's request to discuss compensation structure by calculating Walshe's numbers ($329,000 in revenue minus $131,000 salary/benefits, $26,000 ADP/taxes, and $5,000 business development expenses) to come up with $165,000 minus "overhead"). This evidence demonstrates Zabors' intention that Walshe receive "something more" than salary and benefits for bringing Quanta revenue to Enovation.

Notably, in the email to Zabors discussing what constitutes a "director/partner" at Enovation, Walshe stated that, "The delineation for becoming a Director is almost entirely on a demonstrated ability to sell more work. ... A threshold of originating $1 million of work per year seems like a reasonable standard to make director." Ex. 8 at 2. On its face, Walshe's statement may appear to be a concession that, to receive any compensation more than salary and benefits, a director/partner must generate more than $1 million in sales each year. However, in the "$1 million/year" context, Walshe expressed his view that directors should be the only employees receiving equity in the company; separately, Walshe discussed his views on bonuses. *Id.* Thus, the Court finds Walshe, by making these statements, did not concede that a director must generate $1 million in business before receiving some sort of bonus or distribution; in fact, in response to Walshe's statements,

8

Zabors asked, "Do you think people will go for a $1m minimum? It's subtly there already with the draw . . . *but assume people always deserve bonus*." Ex. 8 at 1 (emphasis added).

The Court finds the evidence demonstrates Zabors promised Walshe a form of compensation over and above Walshe's salary and benefits, whether in "cash" or "equity," for Walshe's agreement to bring his client, Quanta, to Enovation.

> 2. Expectation that Promise Would Induce Action or Forbearance by the Promise

The evidence at trial reflects that Walshe repeatedly emailed Zabors during the course of his employment at Enovation seeking resolution of the formulation of a compensation structure for himself and the "partners" at Enovation; in response to each email, Zabors assured Walshe that he was also interested in, and working on, resolving the issues. *See*, *e.g.*, Exs. 8, 12, 20, 21, 27, 29 at 2, 38 at 1. In fact, in June/July 2014, Walshe and Zabors exchanged emails again discussing an "equity model" by which the "partners" at Enovation would be compensated; Walshe informed Zabors that, if they could not agree to a compensation structure, he would need to "begin disentangling [their] relationship." Ex. 27 at 2. Zabors responded saying he hoped Walshe did not intend to resign (*id.*), and days later, Zabors told Walshe "I think you deserve a large/the largest bonus" and "[i]f you need $95k immediately, then I'll make it happen." Ex. 31. Zabors testified that, at the time, he was "encouraging Mr. Walshe to remain at Enovation Partners." Tr. 472: 15-17.

In another effort to assuage Walshe's concerns, Zabors emailed him on June 5, 2014 and attached a copy of a draft "Operating Agreement" for Enovation explaining that no compensation structure could be finalized until an investor/partner, GTI, signed the agreement, but the agreement was still being negotiated. Ex. 26. As it turns out, the draft sent to Walshe was not being negotiated,

and GTI had actually executed Enovation's Amended[3] Operating Agreement on December 30, 2013. Ex. 10.

The Court finds the evidence shows Zabors expected that his promise would induce Walshe (and Quanta) to stay on at Enovation and/or not to resign from the company.

> 3.      The Promisee in Fact Reasonably Relied on the Promise to His Detriment

The evidence demonstrates by a preponderance of the evidence that Walshe performed work for Quanta while at Enovation, which resulted in a total of $402,808.00 in client revenue (income) to Enovation. Ex. 24 at 4, Ex. 59 at 4. In addition, Walshe sought an extension for filing his tax return in 2014 based on Zabors' promise of a distribution. In June 2014, Walshe prompted Zabors again to discuss the compensation structure saying, "I think if we each had a common perspective on what you had in mind when we were talking last August, my decisionmaking and timeline to get things finalized would have been different." Ex. 27.

As time went on, Walshe and Zabors continued to discuss the compensation structure, but on September 4, 2014, Walshe first learned that GTI paid $900,000 directly to Zabors (not Enovation) for its membership interest in Enovation (Tr. 201: 19–25, 202: 1–10), and on September 17, 2014, Zabors "totally" disagreed with Walshe that they needed profit and loss information for all other partners during the previous year to fashion a compensation structure (Exs. 38, 41); thereafter, the discussions apparently stopped between Walshe and Zabors. On October 1, 2014, Walshe drafted a letter to Zabors stating, "I have appreciated the time you spent with me . . . to try to develop some agreement on how Enovation Partners' equity might be divided. . . . However, I have concluded that I can no longer wait until the various uncertainties are resolved, and this letter

---

[3]As set forth above, the copy of the original Operating Agreement provided at trial was executed only by Zabors and Clark on July 1, 2013. Ex. 7.

is to inform you of my intent to resign and disentangle from our existing business relationship inside Enovation." Ex. 50. Walshe also requested that the revenue generated by Quanta be "reverted back to ION" minus expenses, such as his salary draw, health care, and business development costs. *Id.*

However, to his detriment, Walshe received no additional compensation or distribution before or after his departure from Enovation for generating the Quanta revenue for Enovation. Had Walshe stayed at ION, his testimony was that he was drawing approximately $30,000/month salary as opposed to the $13,000/month salary draw at Enovation. Tr. 42: 15-18.

> 4.      The Promise Must Be Enforced to Prevent Injustice

In Colorado, "the purpose of the doctrine of promissory estoppel is to rectify the plaintiff's detrimental change of position." *Mooney v. Craddock*, 530 P.2d 1302, 1305 (Colo. App. 1974). In *Mooney*, the plaintiff alleged that in reliance on the defendant's (eventually unfulfilled) promise to construct an athletic club in an existing building, the plaintiff "made substantial expenditures of time and money," including installing a sauna in the building. *Id.* The court concluded that "the proper measure of recovery under the circumstances of this case is an award of damages sufficient to compensate for the actual loss sustained as measured by expenditures made together with the market value of the sauna which accrued to the benefit of [defendant]." *Id.*; *see also Zick v. Krob*, 872 P.2d 1290, 1295 (Colo. App. 1993), *cert. denied* (May 4, 1994) ("Damages awarded in a sufficient amount to compensate for the actual loss sustained is a proper remedy.").

In this case, the Court concludes Walshe's actual loss sustained was the additional compensation, or "bonus," he was promised based on revenue generated by his work with Quanta at Enovation.

The parties produced no evidence reflecting a promise that Walshe was to be treated any differently from the other directors/partners at Enovation with respect to the revenue he actually

generated in early 2014. In September 2014, Walshe and Zabors exchanged emails concerning attempts to schedule a one-on-one meeting to continue discussions regarding the director/partner compensation model. Exs. 38, 41. Walshe expressed his need to have resolution by September 30, 2014 and asked for a meeting on September 19, 2014. Ex. 38. Zabors responded, "I thought the purpose of the meeting was to structure a comp model going forward for you that also can apply to others and help build a better firm. ... I know this is stressful for you, so whatever we discuss will be binding regardless of the group outcome." Ex. 41. To the extent such statement can be construed as a "promise" to treat Walshe differently than the other partners with respect to compensation for revenue generated, the Court construes such promise as prospective, rather than retrospective, concerning any future revenues. Walshe generated no revenue for Enovation after Zabors made this "promise."

With that said, the evidence was unrebutted that other partners/directors at Enovation also generated revenue for the company in 2014. *See* Ex. 24. The evidence also clearly showed that no partner or director at Enovation received additional compensation (above salary and benefits) for the revenue they generated in 2014. Tr. 447: 23-25, 448: 1-6; 505: 12-17; 690: 18-25, 691: 1-5. Zabors explained that no bonuses were distributed because the company was not profitable. Tr. 577: 1-11.

Therefore, the Court finds that, although Walshe detrimentally relied on a promise for additional compensation for revenue he generated through Quanta for Enovation, his actual loss from such detrimental reliance is a form of compensation no other director/partner at Enovation received for the revenue they generated and, thus, the fourth element of Walshe's promissory estoppel claim fails. The Court finds, under these facts, it would be unjust to enforce such promise in this case. The Court will find for Defendants on this claim.

C.    Unjust Enrichment against Defendants

"Unjust enrichment is a form of contract, or quasi-contract, implied by law that does not rely upon a promise between parties." *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009); *see also DCB Constr. Co. v. Central City Dev. Co.*, 965 P.2d 115, 122 (Colo. 1998) (en banc).  "It is a form of restitution designed to restore the plaintiff to his or her prior status." *Id.*(citing Restatement (First) of Restitution § 1 (1937)).  The scope of the equitable remedy of unjust enrichment is broad, "cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008).

To recover on this claim, Walshe must prove by a preponderance of the evidence that (1) at his expense, (2) the Defendants received a benefit; (3) under circumstances making it unjust for the Defendants to retain the benefit without paying for it.  *Harris Grp.*, 209 P.3d at 1205 (citing *Robinson*, 179 P.3d at 1007).

Concerning the third prong, unjust enrichment may be appropriate when "[t]he defendant's wrongful act may be a common-law tort, such as conversion of personal property or trespass to land, or it may be an equitable wrong such as breach of trust or other fiduciary obligation." *Id.* at 1205-06 (citing 1 Palmer, § 2. 1, at 50 and *DCB Constr. Co.*, 965 P.2d at 122 (for a landlord's retention of a benefit to be unjust, there must be "some type of improper, deceitful, or misleading conduct by the landlord")).  Thus, "[u]njust enrichment requires some form of misconduct by [Defendants], such as fraud, coercion, or a clear act of bad faith." *Id.* at 1206.

"If the elements of unjust enrichment are proved, the defendant who received the benefit is normally required to make restitution to the plaintiff in the amount of the enrichment the defendant received.  If the recovery can reasonably be determined by different measurements, the choice of

13

which measurement to use is within the trial court's discretion." *Id.*

As set forth above, the evidence at trial showed Walshe generated revenue in 2014 for Enovation through work with his client, Quanta, whom he brought with him from ION. If Walshe had not transferred to Enovation from ION, the revenue generated would have been credited to ION and, logically, then to Walshe (the sole owner and principal of ION)[4] through some form of compensation distribution. It is undisputed that Enovation received a benefit from the revenue and Walshe received no compensation distribution from that revenue *and* took a pay cut when he joined Enovation; thus, Walshe has proved the first two elements of the claim. Therefore, the question is whether Walshe has proved by a preponderance of the evidence that Defendants retained the benefit under "unjust" circumstances – *i.e.*, Defendants engaged in misconduct, such as fraud, coercion, or a clear act of bad faith.[5]

Walshe argued at trial that Zabors' conduct in "string[ing] [Walshe] on for months and months" (Tr. 790: 18-20) knowing he had already executed Operating Agreements with GTI, but

---

[4] Walshe testified (without rebuttal) that his company, Altera Energy d/b/a ION Consulting is a subchapter S corporation that was originally formed in 1997 as Altera Energy. Tr. 23: 16–22. In or around 2006, Walshe and "a group of people" formed a company called ION Consulting LLC based in Nevada, but that company dissolved in 2009-2010. *Id.* 24: 3–6. At that time, Walshe registered his company as Altera Energy d/b/a ION Consulting. *Id.* 24: 6-8. As set forth herein, once Walshe joined Enovation, he brought ION work and clients with him to Enovation (*see* Ex. 60), and ION was, practically speaking, "dormant." Tr. 29: 2–22. In essence then, Walshe, as sole owner having complete control over ION, was its "alter ego." *See Lester v. Career Bldg. Acad.*, 338 P.3d 1054, 1062–63 (Colo. App. 2014).

[5] Courts "have looked to the intentions, expectations, and behavior of the parties to determine whether recovery in unjust enrichment is appropriate." *Lewis v. Lewis*, 189 P.3d 1134, 1143 (Colo. 2008) (en banc). In *Lewis*, the court distinguished between an "arms-length" business relationship and a "confidential" or "familial" relationship of the parties in analyzing the third prong. *Id.* While the facts in this case demonstrate a closer relationship than that in *DCB Constr. Co.*, 965 P.2d at 122 (tenant's contractor and building landlord), the Court does not find the relationship between Walshe and Zabors to be "confidential" as described in *Lewis*, so to justify a different and less restrictive analysis of the third prong. *Id.* (for a "confidential" relationship, the plaintiff need not show malfeasance).

telling Walshe the Operating Agreement was still being negotiated; providing Walshe (at Walshe's request) with a "fake" draft Operating Agreement months after the fully executed Amended Operating Agreement was in place; and, continually promising to finalize a compensation model as suggested by Walshe for the directors/partners knowing it would be inconsistent with the Agreement already in place constitutes "bad faith" for purposes of this claim.

Based on applicable law, bad faith conduct may be that which is "improper, deceitful, or misleading." *DCB Constr. Co.*, 965 P.2d at 122. The Court finds credible Walshe's testimony that Zabors did not inform him and he did not know of the existence of the July 2013 Operating Agreement or December 2013 Amended Operating Agreement[6] during his employment at Enovation (Tr. 36: 13-17; 70: 14-17; 75: 1-3); Zabors never informed him and he did not know the content of the Agreements concerning ownership percentages among Zabors, Clark, and GTI (Tr. 72: 16-18); Zabors repeatedly told Walshe GTI was "being obstinate" in finalizing negotiations of the Operating Agreement although Operating Agreements were already in place (Tr. 75: 22-25, 76: 1-4); and Zabors told him that once the Operating Agreement was executed with GTI, the partners/directors' compensation model could be finalized (Tr. 48: 17-24).

Walshe's email communications with Zabors are consistent with this testimony. *See*, *e.g.*, Exs. 12 at 1, 25, 26. For example, on February 24, 2014, Zabors emailed Walshe stating, "On gti, there's good news like Sumi and continued delays on finalizing our operating agreement, which should have happened months ago." Ex. 12 at 1. Later, when Walshe asked for a copy of the draft

---

[6]Again, Defendants pointed out at trial that GTI (or a representative thereof) did not execute the July 2013 Operating Agreement. *See* Ex. 7. However, the December 2013 Amended Operating Agreement provides, "WHEREAS, the Members entered into an Operating Agreement dated as of July 1, 2013." Ex. 10. The "Members" in both agreements included GTI. *See id.* In addition, it cannot be disputed that an "Amended" agreement would not have been necessary without the existence of the original agreement.

Operating Agreement (which, he believed, was still being negotiated) in June 2014, Zabors sent him a "draft" agreement that was consistent with neither the July 2013 Operating Agreement nor December 2013 Amended Operating Agreement. Ex. 26 at 3-20. Moreover, Zabors expressed to Walshe that "the current capital structure in this [attached draft] is as of 5/14/13 - the date we started" and that the *actual* capital structure was divided among GTI, Zabors, Clark, Kemp, and 25% to the "Founding Partners Equity Plan." Ex. 26 at 1. However, Zabors' statement was not true; the capital structure set forth in Exhibit A of the "fake" Agreement was the same as that set forth in the Amended Operating Agreement already in place—reflecting ownership percentages of 67.5% for Zabors, 22.5% for Clark, and 10% for GTI—except merely for the dilution status of GTI's interest. *Compare* Ex. 26 at 20 *with* Ex. 10 at 20.

Both Zabors and William Kemp, Enovation Member and Director, testified that all partners/ directors, including Walshe, knew or should have known about the existing Operating Agreements at Enovation in 2013 and 2014. First, however, the Court notes that neither Zabors nor Kemp is necessarily unbiased or unaffected by the outcome of this case as members of the LLC. Second, it is undisputed that Enovation directors were not located in the same office, but worked in separate offices in different states and, as such, communications were primarily by email or telephone.[7] Third, Kemp's testimony that Walshe was present at director meetings at which attendees discussed "conditions under which GTI might give up its non-dilution rights if we brought in new investment capital" (Tr. 695: 7–21) is not inconsistent with Walshe's testimony that he knew the terms of an Operating Agreement were being negotiated, but did not know an Operating Agreement was already in place. Fourth, Kemp testified that he knew of the existence of the December 2013 Amended

---

[7]In other words, Walshe did not work in a location at which other Enovation members or employees worked, and he did not have physical access to the existing operating agreements.

Operating Agreement and stated that *he* participated with Zabors in negotiating sessions with GTI (Tr. 698: 21–25, 699: 1–2); but, there is no evidence that Walshe ever participated in any meeting with GTI concerning amendment of either Operating Agreement.  Fifth, Kemp's testimony that a "status of the Operating Agreement negotiations . . . was usually an agenda item when we got together physically as a director group" also is not inconsistent with Walshe's testimony (Tr. 700: 9–13);  additionally, the record in this case contains copies of the agendas for the December 3, 2013, April 24, 2014, and July 16, 2014 "physical" meetings, but none of them list "operating agreement negotiations" or such similar topic as an agenda item.[8]  Exs. 9, 18, 28.

The Court finds Zabors' conduct in failing to inform Walshe of the existing July 2013 Operating Agreement and December 2013 Amended Operating Agreement, and leading Walshe to believe an Operating Agreement was still being negotiated and would include a 25% ownership interest for the "founding partners" (or other allocation "based on proportional production" (Tr. 78: 20-24)) during months when Walshe was generating revenue for Enovation to be improper, deceitful, or misleading.[9]  *See DCB Constr. Co.*, 965 P.2d at 122.  The Court also finds credible Walshe's testimony that, had he learned in early 2014 (at the time of or before generation of Quanta revenue) of the existence of the Amended Operating Agreement and the stipulated "ownership percentages" contained therein (Ex. 10 at 20), he would have left Enovation because "things that [Zabors] had been telling [him] repeatedly were explicitly false."  Tr. 85: 3-10; *see id.* at 121–22

---

[8]The only agenda item that might include discussion of the negotiations of an operating agreement is on the April 25, 2014 agenda, which lists "GTI Update - Bob."  However, as set forth herein, GTI's role with respect to Enovation extended to more than just "investor"; GTI provided Enovation with HR and accounting services, and worked with Enovation on certain projects (*i.e.*, Sumitomo).  Accordingly, the "update" could have involved subject matter for any of these roles.

[9]Notably, the equity distribution that actually occurred in December 2014 (three months after Walshe resigned) included a total of 7.5% to directors/partners effective 1/1/2015, and another 1%, with .5% of that portion effective 1/1/2016 and the other .5% effective 1/1/2017.  Ex. 55.

("If, for example, a landlord has actually engaged in fraud to induce a contractor . . . to continue performance when the contractor might otherwise have ceased, this situation will likely sustain a claim of unjust enrichment."). Accordingly, the Court concludes Walshe proved all elements of his unjust enrichment claim by a preponderance of the evidence and will find in Walshe's favor on this portion of the claim.

However, in addition to client revenue from Quanta, Walshe seeks payment for the work he performed on the "Sumitomo" project in November and December 2013 and January 2014 while at Enovation. Tr. 252: 23–25, 253: 1–7. Here, the Court need not delve into an extensive analysis on each element of the claim. The Court finds no evidence that Walshe's work on the Sumitomo project was "at his expense" (it is undisputed he was receiving a salary and benefits during that period) nor of misconduct by Defendants in retaining the revenue from the Sumitomo project. Judgment will be entered in favor of Defendants on this portion of the claim.

With respect to Walshe's damages, the Court must determine "the amount of the enrichment" Defendants received. *See Lewis*, 189 P.3d at 1141 ("The proper remedy upon a finding of unjust enrichment is to restore the harmed party 'to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its monetary equivalent.'"). The Court finds Enovation was enriched by the revenues generated by Walshe's work with Quanta at Enovation ($340,767 + $62,041 = $402,808 (Tr. 249: 1–13; 667: 22–25, 668: 1–7 ))[10] minus the salary, benefits, fees, and taxes Enovation paid to and on behalf of Walshe ($162,000 (Ex. 31)), and minus the overhead costs,[11] which Walshe certainly would have paid in some measure had he

[10]There was no evidence refuting the fact that these revenues were not only billed by Enovation, but also paid directly to Enovation. *See* Tr. 109: 4–7.

[11]None of these numbers were challenged nor rebutted by Defendants. Furthermore, although there was evidence that an Enovation employee, Mike Granowski, assisted Walshe with

performed the same work while at ION.

In discussing the overhead costs at Enovation, Zabors suggested to Walshe that they could be divided among "partners" equally or by revenue. Ex. 38 at 7.  The Court finds that, under the circumstances of this case, dividing the overhead costs by revenue (or, the actual "enrichment" unjustly retained) is the proper measure by which to divide costs.  For the fiscal year 2014, Walshe generated 14.75% of the total revenue ($340,767 / $2,313,419).[12]  *See* Exs. 24,59.  According to an Enovation report, the overhead costs at Enovation for the fiscal year 2014 totaled $280,380.  Ex. 24. Multiply that amount by 14.75% equals $41,356.05.  However, as mentioned, Walshe worked another three months at Enovation after the fiscal year ended, and the total revenue he seeks as damages in this case includes revenue generated after the fiscal year (*i.e.*, it does not appear in the financial reports (Tr. 668: 1–7)).  Thus, the Court finds it just and proper to consider the overhead costs from those months; but, because the exact amount of such costs were not presented in evidence, the Court will divide the total amount of Walshe's share of the overhead costs for the fiscal year by 12 ($2,920.63), and add three months of costs ($8,761.88) to Walshe's share for a total of $44,276.68.  Therefore, the enrichment to Enovation can be calculated as follows:

| | | |
|---|---|---|
| CLIENT REVENUE: | $340,767 + $62,041 = | $ 402,808.00 |
| SALARY/BENES/FEES/TAXES: | | ($162,000.00) |
| OVERHEAD: | | ($  44,276.68) |
| TOTAL ENRICHMENT TO ENOVATION: | | $ 196,531.32 |

some work for Quanta (Tr. 238: 8–17), there was no evidence allowing the Court to determine the monetary value of such work.

[12]The Court will not add the revenue Walshe generated *after* the fiscal year to compute the percentage of total revenue generated because the parties did not provide the Court with the amount of total revenue generated after the fiscal year end.

The Court will find partially in favor of Walshe and award the return of $196,531.32 to Walshe for the Defendants' unjust enrichment of the revenue generated by Walshe for Enovation.

     D.     <u>Breach of Fiduciary Duty against Walshe</u>

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Accident & Injury Med. Specialists, P.C. v. Mintz*, 279 P.3d 658, 663 (Colo. 2012) (en banc) (quoting *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993) (en banc)). Independent legal duties of care owed by a fiduciary include a duty to act with utmost loyalty on behalf of, and for the benefit of, the other party. *Id.* (*citing Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo. 1996) (en banc)). Other than those fiduciary relationships recognized as a matter of law, such as attorney-client or trustee-trust beneficiary, the Colorado Supreme Court has recognized other fiduciary relationships where one party occupied a superior position relative to another and assumed a duty to act in the dependent party's best interest and where one party had extensive influence and control over the other's interests. *Id.*

"Fiduciary relationships that derive from a special relationship of trust, reliance, influence, and control are distinguishable from business relationships involving parties dealing at arm's length for mutual benefits." *Id.* (citing *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991) ("[P]arties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties.") and 37 C.J.S. Fraud § 11 (2008) ("Most business relationships or contractual relationships . . . do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial or business transactions.")).

"[I]n Colorado, there exists simply a duty of loyalty arising out of the employer-employee relationship." *Lucht's Concrete Pumping, Inc. v. Horner*, 224 P.3d 355, 360 (Colo. App. 2009),

*rev'd on other grounds by* 255 P.3d 1058 (Colo. 2011).  "[T]he duty of loyalty that an employee owes his or her employer is largely derived from Restatement (Second) of Agency § 387 (1958)" (*id.* citing *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 492 (Colo. 1989)), which "states that 'an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.' It follows that an agent has a corresponding duty 'not to compete with the principal concerning the subject matter of his agency.'" *Id.*

Defendants argued at trial that, based on his employment relationship with Enovation, Walshe breached his fiduciary duties to Enovation by, among other things, continuing to own and work for his company, ION, a competitor, while employed at Enovation; receiving compensation from ION for his work; and retaining trade secrets and confidential information owned by Enovation, for his own pecuniary benefit or the benefit of ION.

Here, the Court finds it is undisputed that Walshe, as a "Director" of Enovation, owed the company a duty of loyalty.  *See Horner*, 224 P.3d at 361; *Mulei*, 771 P.2d at 492.  However, other than the fact that Walshe performed no "billable" time in July, August, and September 2014 (Ex. N at 2), Defendants produced no evidence supporting their arguments that Walshe continued to work for ION and/or received compensation from ION during his employment with Enovation.  Further, there was no evidence at trial that Walshe retained Enovation's trade secrets and confidential information for his or ION's pecuniary benefit.  Finally, Defendants did not rebut Walshe's testimony that he drafted more than 900 emails during the July/August/September 2014 time period concerning business development for Enovation, including soliciting Enerfab for a potential project. Tr. 178: 6-15; *see also* Exs. 33, 37, 39, 41, 50.

Having heard no evidence that Walshe breached his duty of loyalty to Enovation, the Court will enter judgment in favor of Walshe on this claim.

21

E.     Misappropriation of Trade Secrets against Walshe

"[A]ctions for damages or injunctive relief from the misappropriation of trade secrets are governed by statute." *Gognat v. Ellsworth*, 259 P.3d 497, 500 (Colo. 2011) (en banc) (citing Colo. Rev. Stat. §§ 7-74-101 to -110 ("Uniform Trade Secrets Act")).

> "Misappropriation" is defined broadly to include the "acquisition" of a trade secret by anyone who has reason to know it was acquired by improper means, as well as the "disclosure" or "use" of a trade secret without consent by anyone who acquired it improperly or had reason to know that his knowledge of it came from someone who got it improperly or under circumstances giving rise to a duty to either keep it secret or limit its use. See § 7-74-102(2). "Trade secret" is defined equally broadly to include all or part of virtually any information that is of value, whether it be in the nature of scientific, technical, business, financial, or professional information, as long as the owner has taken measures to prevent it from becoming available beyond those to whom he has given limited access. See § 7-74-102(4).

*Id.* at 500-01. "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Colo. Rev. Stat. § 7-74-102(1).

"The interpretation of the statutory definition, and therefore the scope, of a 'trade secret,' . . . is a question of law for the court." *Gognat*, 259 P.3d at 502 (citing *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 641 (Colo. 1988) (en banc)). "Although an exact definition of a trade secret may not be possible, the following factors may be considered in the determination whether a trade secret exists:

1) the extent to which the information is known outside the business;

2) the extent to which it is known to those inside the business, i.e., by the employees;

3) the precautions taken by the holder of the trade secret to guard the secrecy of the information;

4) the savings effected and the value to the holder in having the information as against competitors;

5) the amount of effort or money expended in obtaining and developing the information; and

6) the amount of time and expense it would take for others to acquire and duplicate the information."

*Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 521-22 (Colo. App. 2011); *see also Colo. Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990).

Defendants argued at trial that Walshe's conduct after he left Enovation violated Colo. Rev. Stat. §7-74-102(2)(b)(II)(B), which provides:

(2) "Misappropriation" means:

\*\*\*

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

\*\*\*

(II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:

\*\*\*

(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

\*\*\*

Def. Tr. Br. 11.[13]   Defendants contended, "Walshe knew he had an obligation to maintain the confidentiality [of] the trade secrets he acquired during his employment at Enovation, yet flouted that obligation by retaining the information and implicitly using it in his competing business." *Id.* at 12.

---

[13]Defendants actually cite Colo. Rev. Stat. §7-74-102(2)(b)(II)(*A*) ("Derived from or through a person who had utilized improper means to acquire it"), but the context of the argument falls under subsection 102(2)(b)(II)(B); thus, the Court will construe Defendants' citation as a typographical error.

Here, the information at issue is contained in Exs. H, I, and J. Even assuming these documents contain trade secrets, the Court finds Defendants produced no persuasive evidence that Walshe "disclosed or used" the documents or information contained therein sufficient to support a misappropriation claim. The Court will find in favor of Walshe on this claim.

F.     Conversion against Walshe

"Conversion is 'any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another.'" *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. App. 2008) (quoting *Glenn Arms Assocs. v. Century Mortg. & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984)). "Where there is a wrongful taking, the tort of conversion is complete upon that taking; the victim does not have to demand return of the goods nor does the wrongdoer have to refuse such a demand." *Montgomery Ward & Co., Inc. v. Andrews*, 736 P.2d 40, 46 (Colo. App. 1987) (citing *Colo. Kenworth Corp. v. Whitworth*, 357 P.2d 626 (Colo. 1960)).

Walshe testified he received exhibits H (Tr. 360: 12–25, 361: 1–17), I (*id.* 363: 15–23), J (368: 4–25, 369: 1–14), and JJ, the cover email for exhibit J. (*id.* 364: 11–25). Walshe confirmed that he stored copies of emails from his time at Enovation, possibly containing confidential information, on a flash drive currently in his possession. *Id.* 349: 8–25, 350: 1–3. There was no evidence rebutting the fact that these documents belonged to Enovation. Therefore, the Court will find in favor of the Defendants on their conversion claim.

At trial, Defendants conceded that they disclosed to Walshe no information concerning monetary damages for their counterclaims; however, they argued the evidence supported their request for injunctive relief. The Court dismissed Defendants' claims for legal damages, but proceeded on the claims for injunctive relief (Tr. 22: 3–5), which were stated in the Counterclaims as follows:

(1) Ordering that Mr. Walshe produce for inspection, imaging, and searching any computers, servers, mobile devices, or other computer systems that might have stored, or currently store, any Enovation property or Sensitive Information;

(2) Entering an injunction against Mr. Walshe, his agents, employers, and other representatives, requiring that they return to Enovation property, including all confidential, proprietary, and Sensitive Information in their possession, custody, or control; . . .

First Am. Answer & Countercl., ECF No. 39. The Court finds Walshe's admission during testimony that he possessed copies of emails from Enovation, likely containing the documents as attachments, on a flash drive to be sufficient to render null the Defendants' request for an order to search Walshe's electronic devices. However, the Court will order that Walshe return to Defendants any hard copies, or destroy any electronic copies, he may possess of Exhibits H, I, J, and JJ.

## III.    Conclusion

In sum, the Court finds partially in favor of Walshe on the breach of contract and unjust enrichment claims and in his favor on the breach of fiduciary duty and misappropriation of trade secrets counterclaims. The Court finds in favor of Defendants on the promissory estoppel claim and conversion counterclaim. As such, for the breach of contract and unjust enrichment claims, Walshe is awarded a total of $207,400.72 in damages plus interest at the statutory rates until paid. For the conversion counterclaim, Walshe shall return to Defendants any hard copies, or destroy any electronic copies, he may possess of Exhibits H, I, J, and JJ on or before March 31, 2017.

SO ORDERED.

Entered and dated at Denver, Colorado, this 20th day of March, 2017.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

25